# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS

Filed: June 26, 2024

```
* * * * * * * * * * * * * * * * * * * * * * * *
ARON BERAKI,                        *       PUBLISHED
                                    *
                Petitioner,         *       No. 17-243V
                                    *
v.                                  *       Special Master Nora Beth Dorsey
                                    *
SECRETARY OF HEALTH                 *       Ruling on Lost Wage Eligibility;
AND HUMAN SERVICES,                 *       Hepatitis B Vaccine; Bell's Palsy.
                                    *
                Respondent.         *
                                    *
* * * * * * * * * * * * * * * * * * * * * * * *
```

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for Respondent.

### RULING REGARDING PETITIONER'S LOST EARNINGS CLAIM[1]

## I.    INTRODUCTION

On February 21, 2017, Aron Beraki ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleged he suffered from Bell's palsy as the result of a hepatitis B vaccination he received on October 2, 2014.  Petition at 1 (ECF No. 1).  On

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Ruling will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Ruling to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

September 20, 2021, the undersigned issued a Ruling on Entitlement, finding Petitioner entitled to compensation.  Ruling on Entitlement dated Sept. 20, 2021 (ECF No. 75).

Since that ruling, the parties have been in the damages phase of litigation, and have been unable to resolve the appropriate amount of compensation because they disagree about whether Petitioner is entitled to recover for a loss of earnings.  The parties have submitted the issue to the undersigned for adjudication.  After a review of all the evidence, the undersigned finds that Petitioner has proved by preponderant evidence that he is entitled to an award for loss of earnings from October 6, 2014 to October 17, 2014.  Petitioner has not proved by preponderant evidence that he is entitled to an award of lost wages after October 17, 2014.

## II.    PROCEDURAL HISTORY

The procedural history from the filing of the petition through the Ruling on Entitlement is set forth in that ruling and will not be repeated here.  See Ruling on Entitlement at 2.

Since the Ruling on Entitlement, the parties have engaged in damages discussions and Petitioner has filed additional records.  See Pet. Ex. 45-68.  During this time, Petitioner filed four motions to retain a damages expert to support his lost wages claim.  See ECF Nos. 129, 131, 140, 158.

Thereafter, a status conference was held on October 17, 2023.  Order dated Oct. 17, 2023 (ECF No. 167).  The parties agreed the issue ripe for the Court's consideration is whether there is evidence to support a claim for lost wages.  Id. at 1.  The parties agreed to brief the issue.  Id.  Petitioner filed a memorandum on December 4, 2023.  Pet. Memorandum Supporting Loss of Earnings Award ("Pet. Memo."), filed Dec. 4, 2023 (ECF No. 174).  Respondent filed his response on February 1, 2024, and Petitioner filed a reply on February 13, 2024.  Resp. Response and Objection to Pet. Claim for Lost Earnings and Retention of Potential Vocational and/or Economic Experts ("Resp. Response"), filed Feb. 1, 2024 (ECF No. 179); Pet. Reply Supporting Loss of Earnings Award ("Pet. Reply"), filed Feb. 13, 2024 (ECF No. 180).

This matter is now ripe for adjudication.

## III.    ISSUE TO BE DECIDED

The sole issue to be decided is whether there is preponderant evidence to support Petitioner's claim for a loss of earnings award.  See Order dated Oct. 17, 2023; Pet. Memo. at 9; Resp. Response at 1.

## IV.    SUMMARY OF EVIDENCE

### A.    Summary of Medical Records

Petitioner, a pharmacist, was 46 years of age when he received his third hepatitis B vaccination,[3] on October 2, 2014, in his left arm.  Pet. Ex. 1 at 6.  Petitioner's chiropractic records establish that pre-vaccination, in 2013, he had a history of upper and lower back pain, and sharp pain on the left side going down his left arm.  Pet. Ex. 2 at 6.  "Stress at work" and standing for long periods aggravated his pain.  Id.  He also had minor occasional headaches and seasonal allergies.  Id. at 7-8.  In May 2013, Petitioner rated his upper back pain a 7 out of 10, and his lower back pain as a 10.  Id. at 21.  Petitioner's prior medical history is non-contributory as it relates to his Bell's palsy.

On October 6, 2014, Petitioner presented to neurologist Dr. Shahbuddin Mukardamwala, with weakness of the left side of his face.  Pet. Ex. 3 at 1.  Petitioner reported that he had received the hepatitis B vaccine the prior Thursday (October 2, 2014), and that the following day, Friday (October 3, 2014), he had a severe headache involving the left postauricular[4] area. Id.  By Saturday (October 4, 2014), Petitioner was unable to close his left eye and he had numbness of the left side of his face.  Id.  He sought treatment at a local emergency room, where he was noted to have neuropathic pain.  Pet. Ex. 7 at 2.  Petitioner denied having any urinary tract infection, upper respiratory infection, fever, or recent travel.  Pet. Ex. 3 at 1.  Dr. Mukardamwala's physical examination revealed that Petitioner was unable to wrinkle the left side of his forehead, that he had left eye closure weakness, and left nasolabial flattening.  Id.  Dr. Mukardamwala diagnosed Petitioner with "[l]eft peripheral seventh nerve palsy, likely idiopathic;" "[l]eft postauricular pain;" and "[c]hronic lower back pain."  Id. at 2.  Prescriptions were given for prednisone, Valtrex,[5] and Vitamin B12.  Id.  Petitioner requested a work excuse form.  Id.  "He state[d] that he work[ed] [] two days a week, and given his ability to close the eye and frequent dryness issues, he [would] not be able to work.  Patient was given [the] requested form."  Id.

Petitioner returned to see Dr. Mukardamwala on October 13, 2014, with worsening of his left postauricular pain.  Pet. Ex. 3 at 3.  He also reported a history of chronic neck pain and

---

[3] The hepatitis B vaccine is given in a series of three doses on a zero, one-month, and six-month schedule.  See Pet. Exhibit ("Ex.") 41 at 2.  Petitioner received the ENGERIX-B vaccine.  Pet. Ex. 1 at 6.

[4] The postauricular area is behind or posterior to the auricle, the exterior portion, of the ear. Postauricular, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/ definition?id=40478 (last visited June 5, 2024); Auricula, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=4877 (last visited June 5, 2024).

[5] "Valtrex (valacyclovir) is an antiviral medication used to treat infections with[] herpes zoster (shingles), herpes simplex genitalis (genital herpes), and herpes labialis (cold sores)."  Valtrex, RxList, https://www.rxlist.com/valtrex-drug.htm (last visited June 5, 2024).

complained of some "tightness of his right side of the face." Id.  Petitioner was advised to discontinue Valtrex due to fatigue.  Id.  Petitioner "stated that [a] heating pad help[ed] with [his] postauricular pain."  Id.  Ibuprofen did not help the pain, although hydrocodone helped "to some extent."  Id.  Petitioner reported no other symptoms.  Id.  Assessment was "[l]eft peripheral seventh nerve palsy, likely idiopathic;" "[p]ostauricular pain;" "[c]hronic neck pain;" and [f]atigue."  Id.  Magnetic resonance imaging ("MRI") was ordered, which did not show any acute intracranial process.  Id.; Pet. Ex. 5 at 15.  Petitioner was given Cymbalta[6] samples for pain.  Pet. Ex. 3 at 3.

Dr. Mukardamwala next saw Petitioner on October 17, 2014 for continued symptoms. Pet. Ex. 3 at 4.  The day before, he called to report "severe left-sided occipital temporal headaches with subjective feeling of numbness."  Id.  Dr. Mukardamwala increased the dose of Cymbalta, which Petitioner stated did not help him.  Id.  Petitioner also reported "lower back pain," which he had previously received chiropractic treatment for.  Id.  Physical examination showed Petitioner's eye closure had improved.  Id.  Petitioner underwent an occipital nerve block.  Id.  He "tolerated the procedure well and reported symptomatic improvement."  Id. at 5. He "requested medication for anxiety and breakthrough pain" and was given "10 tablets of Tylenol #3[] and 10 tables of Ativan 1 mg as needed."  Id.  Petitioner also wanted to try acupuncture and Dr. Mukardamwala wrote a prescription for physical therapy.  Id.  Dr. Mukardamwala's assessment was "[l]eft peripheral seventh nerve palsy, likely idiopathic," and was "[i]mproving gradually;" "[p]ostauricular pain;" "[o]ccipital neuralgia;" and "[a]nxiety."  Id. at 4.  Dr. Mukardamwala reviewed the normal MRI findings.  Id.  Petitioner requested an excuse for work, "[h]owever, [Dr. Mukardamwala] discussed with him that his symptoms have been improving, and he may return to work."  Id.

On November 4, 2014, Petitioner returned for follow-up.  Pet. Ex. 3 at 6.  Since receiving the nerve block at the previous visit, "his pain [was] better."  Id.  He had been to the chiropractor and the treatment had "relieved his muscle tension."  Id.  He "report[ed] improvement in his symptoms."  Id.  He did not go to physical therapy because he read online that "he should not [overexert] himself."  Id.  Petitioner also stated that he had contacted a lawyer for compensation, "as he believe[d] that hepatitis vaccine caused hi[s] Bell's palsy."  Id.  Assessment was "[l]eft [] seventh nerve palsy, improving;" "[o]ccipital neuralgia, resolved;" and "[a]nxiety, better."  Id.  Dr. Mukardamwala noted that Petitioner was "improving gradually."  Id.  "His facial strength was better," his "[l]eft nasolabial fold [was] reappearing," "[h]is forehead wrinkling ha[d] improved," and he had "improvement in blinking on left side."  Id.

Petitioner next saw Dr. Mukardamwala for follow-up on January 5, 2015.  Pet. Ex. 3 at 7. He stated that before his last visit in November 2014, he began having panic episodes at night. Id.  In one week, he had three panic episodes.  Id.  "[H]e suddenly gets up and screams and he starts running and he feels being chased.  This lasts for one minute before he comes to himself. Then he comes to realization and settles down."  Id.  He admitted having palpitations, feeling of

---

[6] "Cymbalta (duloxetine) is a selective serotonin and norepinephrine reuptake inhibitor (SNRI) used for treating depression, anxiety disorder, and pain associated with diabetic peripheral neuropathy or fibromyalgia."  Cymbalta, RxList, https://www.rxlist.com/cymbalta-drug.htm (last visited June 5, 2024).

dying during that episode.  He also report[ed] feeling depressed and anxious," as well as "anger about his situation."  Id.  Petitioner informed Dr. Mukardamwala that he had not returned to work and "now he wants to go back to work with shorter shifts."  Id.  His Bell's palsy had improved—he had a symmetric smile and symmetric forehead wrinkling.  Id.  Assessment was "[l]eft Bell's palsy," "[p]ossible anxiety/panic attacks," "[i]nsomnia," and "[n]ightmares - ? [p]arasomnia."[7]  Id.  Petitioner was advised to take melatonin for insomnia and Paxil for anxiety.  Id.  Dr. Mukardamwala provided a "return to work certificate with his request to work [] shorter shifts (~8 hours)."  Id.

Dr. Mukardamwala next saw Petitioner on February 24, 2015.  Pet. Ex. 3 at 8.  He reported "left facial tightness and facial spasms."  Id.  His nightmares had improved on Paxil, but he "lack[ed] [a] sense of well being," although he "feels 'ok' during daytime."  Id.  Physical examination showed that his Bell's palsy had improved; he had a "[s]ymmetric smile," and "symmetric forehead wrinkling."  Id.  Assessment was "[l]eft Bell's palsy – great improvement;" "[p]ossible anxiety/panic attacks;" "[i]nsomnia;" "[l]eft facial muscle spasms;" and "[n]ightmare disorder."  Id.  Dr. Mukardamwala advised Petitioner to "use warm compresses for left facial tightness," take Methocarbamol[8] for spasms as needed,  and continue Paxil at a reduced dose.  Id.  Dr. Mukardamwala referred Petitioner to a psychiatrist for anxiety and panic attacks.  Id.

Dr. Salah Qureshi, a psychiatrist, saw Petitioner on March 11, 2015.  Pet. Ex. 6 at 1-5; Pet. Ex. 8 at 2.  Petitioner "report[ed] that in October 2014 he ha[d] an episode of Bells palsy.  It took him a while to recover from it and during the process he became very anxious and depressed."  Pet. Ex. 8 at 2.  He complained of facial pain.  Id.  Petitioner stated that he had sleep disturbances and "found himself shouting and yelling in the middle of the night. . . .  He is having nightmares and flashbacks.  He feels tired.  He is now worried about all these things going on with him."  Id.  Mental status examination revealed that Petitioner was "alert, awake[,] and oriented to [time, place, and person]" and his "mood [was] anxious."  Id.  His affect was "appropriate" and "insight and judgement [were] fair."  Id.  Dr. Qureshi prescribed Effexor[9] and Klonopin[10] and discontinued Paxil.  Id.  There is no indication that Petitioner requested an

---

[7] Parasomnia refers to "a category of sleep disorders in which abnormal physiologic or behavioral events occur during sleep, due to inappropriately timed activation of physiologic systems; it includes nightmare disorder, sleep terror disorder, and sleepwalking disorder."  Parasomnia, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=36982 (last visited June 5, 2024).

[8] "Methocarbamol is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions."  Methocarbamol, RxList, https://www.rxlist.com/methocarbamol/generic-drug.htm (last visited June 5, 2024).

[9] Effexor (venlafaxine) "is used to treat depression, anxiety, panic attacks, and social anxiety disorder (social phobia)."  Venlafaxine, RxList, https://www.rxlist.com/venlafaxine/generic-drug.htm (last visited June 5, 2024).

[10] Klonopin (Clonazepam) "is prescribed for the treatment of anxiety and seizure disorders."  Klonopin, RxList, https://www.rxlist.com/klonopin-drug.htm (last visited June 5, 2024).

excuse from work and there is no reference to Petitioner's inability to work.  See id.; Pet. Ex. 6 at 4-5.

Petitioner next saw Dr. Qureshi on April 8, 2015.  Pet. Ex. 8 at 3.  At this visit, he reported "feeling better" although he "continue[d] to feel anxious and depressed."  Id.  "He [was] sleeping and eating fair."  Id.  He was taking the prescribed medications and denied any adverse side effects.  Id.  On examination, Petitioner's "mood [was] less depressed, less anxious."  Id.  There was no mention of Petitioner's mental health problems impacting his ability to perform his job.  See id.; Pet. Ex. 6 at 6-7.

On May 6, 2015, Petitioner returned to Dr. Qureshi.  Pet. Ex. 8 at 4.  At this visit, Dr. Qureshi stated that Petitioner presented for his "[post-traumatic stress disorder ("PTSD")] follow up."  Id.  Petitioner "report[ed] feeling less depressed and less anxious."  Id.  Although Effexor XR was less effective than "regular Effexor," Petitioner reported that "Klonopin [was] working well for him."  Id.  Petitioner was "sleeping and eating well."  Id.  He stated that "[h]e [did] not have any other stressors in [his] life."  Id.  Examination showed that Petitioner's "mood [was] less depressed, less anxious."  Id.  He denied "any abnormal perceptions" and insight and judgment were noted to be fair.  Id.  Dr. Qureshi prescribed Celexa[11] in addition to his other medications.  Id.  Dr. Qureshi did not document any concerns about Petitioner's ability to work as a pharmacist.  See id.

Dr. Qureshi next saw Petitioner on June 18, 2015.  Pet. Ex. 8 at 5.  Petitioner reported that he was "feeling better" although he did not think Celexa was working.  Id.  He was "less anxious and less depressed" and he was "not having any nightmares."  Id.  He was also "sleeping and eating fair."  Id.  Dr. Qureshi's diagnosis was "[s]ingle major depressive episode."  Id.  Dr. Qureshi discontinued Celexa and prescribed Wellbutrin.[12]  Id.  Petitioner did not report having any difficulty working as a pharmacist, and Dr. Qureshi did not document any concerns about his ability to work.  See id.

There are no records of visits by Petitioner to see Dr. Qureshi for four months, until October 20, 2015.  Pet. Ex. 8 at 6.  At his visit on October 20, 2015, he stated that he ran out of his medications two weeks before because he missed his appointment.  Id.  He did not feel well and wanted to go back on Effexor and Klonopin.  Id.  He reported "feel[ing] depressed at times," and he was "having some difficulty sleeping."  Id.  He discontinued taking Celexa because "he [did] not like it."  Id.  Dr. Qureshi's diagnoses were "[s]ingle major depressive episode" and "[PTSD]."  Id.  Petitioner did not report any problems with his employment or ability to work.  See id.

---

[11] "Celexa (citalopram hydrobromide) is a type of antidepressant called a selective serotonin reuptake inhibitor (SSRI) indicated for the treatment of depression."  Celexa, RxList, https://www.rxlist.com/celexa-drug.htm (last visited June 5, 2024).

[12] "Wellbutrin (bupropion) is an antidepressant . . . used for the management of major depression and seasonal affective disorder."  Wellbutrin, RxList, https://www.rxlist.com/wellbutrin-drug.htm (last visited June 5, 2024).

Three months later, on January 13, 2016, Petitioner returned to Dr. Qureshi for a follow-up appointment.  Pet. Ex. 8 at 7.  He was "feeling less anxious and less depressed."  Id.  He was "sleeping and eating fair."  Id.  He liked the Wellbutrin.  Id.  His diagnoses remained "[s]ingle major depressive episode" and "[PTSD]."  Id.  Petitioner did not report any problems with his employment or ability to work at this visit.  See id.

Petitioner returned on April 13, 2016, three months later, for follow-up, and reported that he was "doing fine."  Pet. Ex. 8 at 8.  He was "undergoing [a] jury trial for divorce and fe[lt] pressured because of that.  He [was] stressed out financially and [was] also taking care of his [two] year old daughter."  Id.  He felt "overwhelmed," "anxious at time," and had experienced a "panic attack 10 days ago . . . for a few minutes."  Id.  He was "angry and frustrated at his wife" who "initially ran away with his daughter."  Id.  Dr. Qureshi documented that Petitioner was "able to sleep well at night."  Id.  His medications, particularly the Wellbutrin, were "working well for him."  Id.  At the April 13, 2016 visit, Petitioner did not report that he had been terminated from his employment due to failure to obtain approval for leave.  See id.; see also Pet. Ex. 63 at 190.

There are no records of visits to Dr. Qureshi's office after the visit on April 13, 2016 until April 26, 2017, a period of over one year.  See Pet. Ex. 8 at 9.

On April 26, 2017, Petitioner returned to Dr. Qureshi for "[i]ncreased anxiety" and medication refill.  Pet. Ex. 8 at 9.  He reported "feeling very anxious due to ongoing divorce." Id.  He "[was] restless and not able to sleep well."  Id.  He was also "overwhelmed and stressed." Id.  He was "taking care of his daughter" and "looking for a job now."  Id.  Diagnosis was PTSD. Id.  He restarted Klonopin and started Zoloft.[13]  Id.  There was no documentation to suggest that either Petitioner or Dr. Qureshi had any concerns about Petitioner's ability to return to work as a pharmacist.  See id. at 9-10.

Petitioner returned for follow-up of his anxiety to Dr. Qureshi's office on May 10, 2017 and saw Jie Zheng, Physician Assistant ("PA").  Pet. Ex. 8 at 11.  Petitioner was "less depressed and less anxious."  Id.  He reported "sleeping better."  Id.  The subjective history taken from Petitioner stated,

He is a former pharmacist but has not been working due to medical issues and the ongoing divorce and custody.  He is in a lot of stress due to family issues but he does not want to see a therapist.  He states that last week he applied for [S]ocial [S]ecurity [D]isability for the following reasons: herniated [discs], colorectal surgery, depression and anxiety, and [B]ell's palsy secondary to [h]ep[atitis] B immunization.  He may need Dr. Qureshi to sign the paperwork when needed.

Id.  His diagnosis remained PTSD.  Id.  His medications were renewed.  Id. at 11-12.

---

[13] "Zoloft (sertraline) is an SSRI (selective serotonin reuptake inhibitors) antidepressant prescribed for the treatment of[] depression, obsessive compulsive disorder (OCD), panic disorder, [PTSD], [and] social anxiety disorder . . . ."  Zoloft, RxList, https://www.rxlist.com/zoloft-drug.htm (last visited June 5, 2024).

At the next follow-up visit on June 7, 2017, Petitioner saw Quynh Tu Vu, PA.  Pet. Ex. 8 at 13.  Petitioner stated he was "feeling fair," although he "continue[d] to have some anxiety and depression."  Id.  He was "more concerned with the anxiety due to ongoing divorce proceeding and child custody trial."  Id.  "[H]is daughter is everything to him and [he] will do his best to raise her."  Id.  Again, Petitioner reported "sleeping and eating well."  Id.  He also restated that he was in the process of applying for Social Security Disability benefits "for the following reasons: herniated [discs], colorectal surgery, depression and anxiety, and [B]ell's palsy secondary to [h]ep[atitis] B immunization."  Id.  Petitioner requested "some PRN[14] pain med[ications] if possible."  Id.  Prescriptions for refills of Klonopin and new prescriptions for Paxil and Tramadol[15] were given.  Id. at 14.

On August 25, 2017, Petitioner underwent a medical examination for a Social Security Disability determination by Dr. Ron Kirkwood, D.O..  Pet. Ex. 14 at 2-5.  Dr. Kirkwood noted that Petitioner "continue[d] to have some palsy on the left side of his face," and that it affected his eye.  Id. at 2.

Petitioner presented to Dr. Raghu Athre, M.D., on April 25, 2018, complaining of tightness in the left side of his face.  Pet. Ex. 11 at 1.  Petitioner reported that his "muscle tightness [was] due to Bell's palsy" in October 2014, and that he had "pain due to the muscle spasm."  Id. at 3.  Dr. Athre documented that Petitioner had "complete facial nerve movement on the left side."  Id.  Physical examination revealed his "[t]rigeminal nerve [was] intact over all three branches.  No cranial nerve deficits [were] noted."  Id. at 1.  Dr. Athre "explained to the patient that [he] fe[lt] his cosmetic outcome after Bell's palsy [was] excellent."  Id.  Dr. Athre did not recommend any additional treatment for Petitioner's Bell's palsy.  Id.

## B.    Supplemental Medical Records[16]

The following supplemental records were filed after the Ruling on Entitlement issued and in support of Petitioner's damages claims.

### 1.    Memorial Hermann Clinic: 2018 to 2019

---

[14] PRN stands for pro re nata, or "according to circumstances."  P.R.N., Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=40973 (last visited June 5, 2024).

[15] "Ultram (tramadol) is a pain reliever (analgesic) used to treat moderate to moderately severe pain in adults."  Ultram, RxList, https://www.rxlist.com/ultram-drug.htm (last visited June 5, 2024).

[16] See Pet. Exs. 45-68.  The undersigned has reviewed all exhibits filed in this case, including any that are not specifically covered in the Ruling on Entitlement or this Ruling.  If they are not referenced in the Ruling on Entitlement or in this Ruling, there are not materially significant to the issues to be adjudicated.

In 2018 and 2019, Petitioner received medical care at Memorial Hermann Clinic, where he saw family practice physician, Dr. Marlyn Generillo, for general medical care. See Pet. Ex. 49. On May 9, 2018, Petitioner saw Dr. Generillo for low back pain that "started in 2004." Id. at 3. The note from that visit stated that Petitioner was unable to work due to his back pain. Id. Formerly, Petitioner "work[ed] as a pharmacist but standing for long periods of time hurt his back a lot." Id. Dr. Generillo also noted Petitioner's history of severe anxiety. Id. Petitioner's Problem List did not include Bell's palsy. See id. Review of symptoms did not identify any problems secondary to Bell's palsy. See id. Physical examination did not identify any abnormalities related to Bell's palsy. See id. at 3-4. Dr. Generillo refilled Petitioner's prescription for Tylenol #3 and ordered Flexeril and meloxicam for back pain. Id. at 4.

Petitioner returned to see Dr. Generillo on September 27, 2018, complaining of thoracic back pain and rectal pressure. Pet. Ex. 49 at 8. In 2010, Petitioner had a lateral sphincterotomy for a rectal fistula, and he was experiencing rectal pressure symptoms again. Id. Dr. Generillo referred Petitioner to a colorectal surgeon. Id. at 9. There was no mention of any problems with Bell's palsy. See id. at 8-9.

On October 16, 2018, Petitioner saw colorectal surgeon Dr. Mohummed Radwan Khani for "history of weak sphincter muscles." Pet. Ex. 49 at 12. Dr. Khani noted that Petitioner had a past medical history of "stress disorder due to chronic back pain with herniated disc." Id. The appointment focused on Petitioner's rectal pressure and urgency and frequent bowel movements. See id. at 12-13. There was no discussion of Bell's palsy. See id. Petitioner completed a patient questionnaire at this appointment. Id. at 21-23. In the section about past medical history, Petitioner did not document his history of Bell's palsy. See id. at 21. He also did not document any current symptoms related to Bell's palsy in his review of systems. See id. at 23. Petitioner documented his current symptom of anxiety and wrote it was "due to stress from the anal sphincter issue. Excessive [bowel movement] urgency and chronic back problem due to herniated lumbar disc." Id. He did not attribute his current anxiety to Bell's palsy. See id. at 21-23.

The next visit with Dr. Generillo was February 21, 2019, again for back pain. Pet. Ex. 49 at 24. At this visit, Petitioner requested a refill of Soma for his back pain. Id. He said that the Soma also helped with "spasms o[f] his facial muscles." Id. Dr. Generillo refilled the Soma and stated, "consider neuro[logist] referral if not better." Id. at 25. There is no further reference to Bell's palsy in these records. And it does not appear that a referral to a neurologist was made.

Dr. Generillo next saw Petitioner for his annual physical on March 25, 2019. Pet. Ex. 49 at 27-28. There were no issues or problems related to Bell's palsy documented at this visit. See id.

Petitioner saw endocrinologist, Dr. Edward W. Nicklas II, on April 4, 2019, on referral from Dr. Generillo, for follow-up of a thyroid nodule detected by ultrasound. Pet. Ex. 49 at 49-50. Dr. Nicklas' history stated Petitioner's "[m]ain concern [was] chronic back problem, in which [he] [was not] able to do pharmacy work." Id. at 49. Review of systems and physical examination results do not mention Bell's palsy. See id. at 49-50. Dr. Nicklas did not find the ultrasound concerning and recommended follow-up in one year. Id. at 50.

On April 12, 2019, Petitioner saw Dr. Khani in follow-up for his rectal problems and was referred for a colonoscopy.  Pet. Ex. 49 at 62-63.

The last visit to Dr. Generillo was September 12, 2019, when Petitioner presented with cough and congestion, and was diagnosed with an upper respiratory infection.  Pet. Ex. 49 at 65-66.

### 2.    Endocrinology and Gastroenterology Records: 2020 to 2021

Petitioner filed records from visits to specialists in endocrinology and gastroenterology, along with relevant diagnostic studies from 2020 and 2021.  See Pet. Ex. 45 (Digestive Health Center, Bay Area Houston Endoscopy, and other providers); Pet. Ex. 47 (The Endocrinology Clinic, including records from HAR Surgical, Clear Lake Specialties, PA, and other providers).  These records document Petitioner's abdominal pain, hernias, rectal problems, and other gastrointestinal problems.  See id.  Petitioner suffered from gastritis, esophagitis, abdominal pain, inguinal hernia, rectal spasms, and had a past history of sphincterotomy for anal fissure.  See id.  He had continued symptoms of frequency and urgency.  Pet. Ex. 45 at 4, 25.  The records do not discuss Petitioner's Bell's palsy or its sequalae.  See id.  However, Petitioner did reference Bell's palsy in a patient questionnaire he completed on April 22, 2021.  Pet. Ex. 47 at 76.  Petitioner wrote that he was a "Pharmacist 1998-2016.  Couldn't . . . work after March 2016 due to severe pain.  Very frequent urgency to empty [his] bowel.  Severe back pain and neck pain (chronic due to arthritis and disc problems, as well as nerve problems).  PTSD from Bell's palsy which started in October of 2014 after receiving [h]ep[atitis] B [] shot."  Id.

Petitioner's Exhibit 45 also contains some records dating back to 2009 and 2010, relevant to diagnostic studies that show colonic diverticulosis and a surgical pathology report from a rectal biopsy perform August 17, 2010.  Pet. Ex. 45 at 20-22.

### 3.    Texas Behavioral Health: 2022 to 2023

As described above, Petitioner was seen in Dr. Qureshi's office on June 7, 2017.  Pet. Ex. 8 at 13.  There is another gap in records from June 7, 2017 until April 2, 2018.  Pet. Ex. 46 at 2.

On April 2, 2018, Petitioner reported to Dr. Qureshi that in March he was admitted to the hospital for chest pain but was diagnosed with anxiety.  Pet. Ex. 46 at 2.  His primary care physician prescribed Diazepam for anxiety, and he was "doing much better."  Id.  Also, Petitioner "recently received custody of his daughter and he [was] feeling better."  Id.  Dr. Qureshi's diagnosis was PTSD and insomnia, and refills were given for Diazepam, Paxil, and Ambien.  Id. at 2-3.  There was no reference to Petitioner's employment status at this visit.

Jie Zheng, PA saw Petitioner for follow-up on May 3, 2018.  Pet. Ex. 46 at 4.  Petitioner now had "custody of his daughter and [was] happy about it."  Id.  He reported being less depressed and anxious.  Id.  He also left paperwork to support his disability claim with Dr. Qureshi to complete.  Id.  Petitioner "denie[d] other life stressors at present."  Id.  At his follow-up visit on June 4, 2018 with Jie Zheng, PA, Petitioner reported "doing 'ok'" and less depressed

and anxious on his current medications.  Id. at 6.  He had an MRI due to back pain and was taking Tylenol #3 for the pain.  Id.  Petitioner reported some anxiety and stress related to caring for his daughter.  Id.  He was also noted to be in the process of getting a divorce.  Id.  Petitioner's next visit was July 2, 2018, again with Jie Zheng, PA.  Id. at 8.  The records from that visit do not show any substantive changes in Petitioner's condition.  See id. at 8-9.  At these three visits, Petitioner's Bell's palsy was not documented as contributing to his anxiety.  See id. at 4-9.

Petitioner had a telephone visit with Dr. Qureshi on July 17, 2018, and was seen by Sheila Huynh, PA, to complete his disability paperwork.  Pet. Ex. 46 at 11.  He reported that he was "not able to focus" and had been "out of work since March 2016."  Id.  "He complain[ed] of continue[d] pain and not [being] able to stand for [a] long time."  Id.  His current stressor was "out of work[] and divorce complete."  Id.  Petitioner did not identify his Bell's palsy as a current stressor.  See id.  Diagnosis was PTSD and insomnia.  Id. at 12.  Petitioner's medications were refilled.  Id.

On August 7, 2018, Petitioner saw Jie Zheng, PA.  Pet. Ex. 46 at 14.  They discussed his medication regimen.  Id.  He reported being stressed by his divorce case; his next court date was August 22.  Id.  At his next visit on September 7, 2018, Petitioner again saw Jie Zheng, PA.  Id. at 17-18.  There was no history documented.  Id.  Petitioner had a two-month follow-up visit on November 12, 2018 with Jie Zheng, PA.  Id. at 20.  He reported that "he ha[d] been off his medications for several weeks," and he could not make an appointment due to a procedure.  Id.  He was "struggl[ing] with his ex-wife" and reported "she [was] causing troubles."  Id.

Petitioner's records from 2018 visits do not document that he was experiencing stress due to his Bell's palsy; his stressors were documented to be related to obtaining custody of his daughter, his ongoing divorce proceedings, and his finances.  See Pet. Ex. 46 at 2-22.

Petitioner returned to the office and was seen by Jie Zheng, PA on January 22, 2019.  Pet. Ex. 46 at 23.  He had missed his prior appointment and had been off his medications for several weeks.  Id.  He reported "some panic attacks."  Id.  He was "stressed financially."  Id.  Petitioner's medication was refilled.  Id. at 24.  On February 20, 2019, Petitioner stated "he ha[d] been doing 'Okay'" although he reported stress due to finances.  Id. at 26.  On March 29, 2019, Petitioner "denie[d] having panic attacks since [his] last visit" and he thought that Xanax was working well.  Id. at 29.  He was sleeping well with Ambien.  Id.  He remained stressed due to finances.  Id.  He had a court day in May 2019 related to his disability claim.  Id.  On April 26, 2019, Petitioner again saw Jie Zheng, PA.  Id. at 32.  He was stressed due to his "ex-wife" and "worry[ing] about [his] daughter."  Id.  He was also "stressed financially."  Id.  At his visit on May 31, Petitioner reported that he had stress "due to his disability application pending" and from his "back pain."  Id. at 35.  On July 23, he was "stressed due to denial of disability application," "back pain," and finances.  Id. at 38.  At the next visit on September 23, 2019, again with Jie Zheng, PA, Petitioner's stress was "due to his physical pain" and finances.  Id. at 41.  Two months later, on November 21, 2019, he continued to report "feeling stressed due to his back pain.  Id. at 44.  Petitioner's depression and anxiety were described as "fairly well controlled."  Id.

During his visits in 2019, there was no documentation that Petitioner's stress or anxiety was due to Bell's palsy; his reported stressors were related to his finances, ex-wife, worry for his daughter, back pain, and the denial of his disability application.  See Pet. Ex. 46 at 23-46.

Moving to 2020, Petitioner's first appointment was on February 19, 2020, with Jie Zheng, PA.  Pet. Ex. 46 at 47.  He reported that he was not feeling well and was experiencing "deep anger 'about things that don't go with [his] expectation . . . the court . . . the violation [his] daughter's mother is doing . . . this [gave] [him] a lot of stress.'"  Id.  He felt that he could not "get justice."  Id.  Petitioner's medications were adjusted and refilled.  Id. at 47-48.  At his next visit with Jie Zheng, PA, via telemedicine, on June 15, 2020, Petitioner reported "feeling 'fine' since [his] last visit," although he continued to have "anxiety due to his current situation."  Id. at 50.  On September 14, 2020 at a telemedicine visit, Jie Zheng, PA wrote that Petitioner was "feeling somewhat depressed and anxious 'due to the COVID-19 . . . it creates a lot of chaos."  Id. at 53.  He was "worried about this pandemic."  Id.  At Petitioner's telemedicine visit on October 21, 2020, he was reportedly "depressed 'due to COVID-19 and other things.'"  Id. at 56.  Jie Zheng, PA adjusted Petitioner' medications.  Id. at 56-57.  At his visit with Jie Zheng, PA, on November 19, 2020, via telemedicine, Petitioner's current stressors were "financial problems; COVID-19; [and] daughter's online learning."  Id.  His disability claim was denied, and "he [did] not have income to pay property tax."  Id.

In 2021, Petitioner continued to have telemedicine visits.  Pet. Ex. 46 at 62.  On February 24, 2021, Petitioner saw Jie Zheng, PA, and reported "feeling depressed" with little "interest/motivation to do anything."  Id.  His current stressors were finances, the pandemic, and being a single parent caring for his daughter.  Id.  At his follow-up visit on May 21, 2021, Petitioner was seen by Jayma Mickler, PAC.  Id. at 65.  At this visit, Petitioner reported "stress due to past trauma from when he received the [h]ep[atitis] B vaccine and had severe complications after," which "ha[d] severely impacted his life and functioning."  Id.  He reported "feeling hopeless at times" and that his "panic attacks [were] better controlled with the [K]lonopin."  Id.  Jayma Mickler, PAC next saw Petitioner on August 13, 2021.  Id. at 67.  Dr. Khwaja Tariq signed off on the note from this visit as the supervising physician.  Id. at 68.  Petitioner's current stressors were "mental illness and finances."  Id. at 67.  "He report[ed] he [was] not able to receive the Covid 19 vaccine due to complications from previous vaccines, therefore he [was] now even more isolative.  He report[ed] feeling lonely."  Id.  At his last visit in 2021, on November 9, 2021, Petitioner was seen by Oghale Mukoro, PMHNP.  Id. at 69.  At this visit, Petitioner reported "[f]eeling down, depressed, or hopeless [n]early every day."  Id.  He was assessed with moderately severe depression.  Id. at 70.  His current stressor was finances.  Id. at 69.

Petitioner continued to have follow-up visits in 2022.  He was seen by Jayma Mickler, PAC for four visits, all conducted remotely through telemedicine.  Pet. Ex. 55 at 2-14.  Dr. Tariq signed off as the supervising physician.  Id.  All of the visits were for "follow up treatment of depression[] [and] anxiety."  Id. at 2, 5, 8, 11.  On the first of the four appointments, on February 9, 2022, Petitioner reported "depressed mood, anhedonia, and lack of motivation" as well as "ongoing anxiety and excessive worrying."  Id. at 2.  However, his medications were helping and he wanted to continue his current regimen of Klonopin, Ambien, and Zoloft.  Id.  Stressors included "dealing with mental illness and finances."  Id.  Examination revealed that Petitioner's

short- and long-term memory were normal, that attention was normal, and insight and judgment were described as fair.  Id. at 2-3.  Diagnoses were "[m]ajor depressive disorder, recurrent episode, moderate;" "[g]eneralized anxiety disorder;" and PTSD.  Id. at 3.

Medical records from Petitioner's appointments on May 9, August 1, and November 1, 2022, were all very similar.  See Pet. Ex. 55 at 5-14.  On May 9, Petitioner reported that his current stressors included "dealing with mental illness and finances."  Id. at 5.  At the visit on August 1, Petitioner reported "depression and anxiety related to his past trauma.  He report[ed] he ha[d] started therapy to work through these issues."  Id. at 8.  The past trauma was not described in the records.  See id.  Bell's palsy, or its residual effects, was not mentioned.  See id.  Although the note stated that he had started therapy, the name of the therapist was not identified.  See id.  In the last visit, on November 1, 2022, Petitioner reported that his current stressors were "dealing with mental illness" and "related to finances and trouble gaining SSI [disability]."  Id. at 11.

Petitioner was seen by Dr. Tariq for a remote telemedicine visit on January 13, 2023.  Pet. Ex. 59 at 2.  Chief complaint was "legal evaluation."  Id. (emphasis omitted).  The purpose of the visit was for a "legal evaluation" of Petitioner's "current mental status."  Id. (emphasis omitted).  The evaluation was done "in the context of [Petitioner's] lawyers wanting to talk to supervising provider about patient's current mental status."  Id.  Petitioner reported "low mood, anhedonia, lack of energy, feelings of hopelessness, insomnia[,] and feelings of helplessness."  Id.  He also "discussed the impact his facial palsy [] had on his mental health."  Id.  He reported that he never had "depression or anxiety prior to the facial palsy.  He fe[lt] the facial palsy, through the symptoms it caused [] including head and neck pain, change in appearance etc. ha[d] impaired him to the point that he has no meaningful ability to function socially or occupationally."  Id.  Petitioner acknowledged "mild improvement in his depressive and anxiety symptoms with medication [] and psychotherapy."  Id.  On examination, Dr. Tariq noted Petitioner's thought process was "[l]ogical and linear," his short- and long-term memory were normal, his attention span was normal, and insight and judgment were fair.  Id. at 3.  Dr. Tariq's diagnoses included "[m]ajor depressive disorder, recurrent episode, moderate;" "[g]eneralized anxiety disorder;" and PTSD.  Id.  Petitioner agreed to continue his current medications, which included Ambien for sleep as needed, Zoloft daily, Klonopin as needed three times per day, and Trazodone at bedtime as needed.  Id.

In addition to the medical records, Dr. Tariq wrote two versions of a "Psychiatric Opinion Letter," both dated February 2, 2023, regarding his visit with Petitioner on January 13, 2023.  Pet. Exs. 57-58.  In the first, Dr. Tariq stated that Petitioner had been under his care since May 2021, through Jayma Mickler, PAC, and that he was seen for a comprehensive evaluation on January 13, 2023.  Pet. Ex. 57 at 1; see Pet. Ex. 46 at 65; Pet. Ex. 59 at 2.  Dr. Tariq stated that despite treatment with medication and psychotherapy, Petitioner had "not experienced any meaningful or lasting improvement in his symptoms."  Pet. Ex. 57 at 1.  Dr. Tariq also stated that Petitioner "consistently cited his facial palsy as his primary stressor."  Id.  When seen on January 13, 2013, Petitioner was described as "severely depressed and anxious."[17]  Id. at 1-2.  Dr. Tariq

---

[17] This statement is in contrast with Dr. Tariq's record on January 13, in which he diagnosed Petitioner with "moderate" but not severe depression.  Pet. Ex. 59 at 3.

concluded that it was his opinion that "the facial palsy subsequent to [h]epatitis B vaccination in October of 2014 is the most important predisposing and precipitating factor in the etiology of [Petitioner's] current psychiatric symptoms." Id. at 2.  Dr. Tariq added that "[t]he changes in [Petitioner's] appearance and functioning of his facial muscles, as well as head and neck pain resulting from the Bell's [p]alsy continue to be perpetuating factors for his mood, anxiety[,] and PTSD symptoms." Id.

The second opinion letter is similar to the first but added a paragraph about Petitioner's inability to work.  See Pet. Ex. 58 at 2.  Dr. Tariq concluded that "[d]ue to the severity and persistence of his symptoms, [Petitioner] is experiencing marked impairment of his social and occupational functioning.  At his current level of functioning[,] it is not possible for [Petitioner] to safely and adequately perform work duties as a [p]harmacist." Id. at 2.  Further, Dr. Tariq concluded that "[b]ased on his current mental status[,] [Petitioner] is not able to perform meaningful vocational duties in any capacity." Id.

### 4.      Village Medical: 2022

Petitioner also filed the records from Dr. Mark Aguilar at Village Medical.  Pet. Ex. 60.  These records document two visits.  The first, dated June 29, 2022, was for an annual examination.  Id. at 31.  At that visit, Petitioner's depression and anxiety were described as "stable." Id. at 35.  The second visit was November 23, 2022, for an upper respiratory infection.  Id. at 26-29.

### 5.      Texas Pain Physicians: 2021 to 2022

Petitioner was seen by Dr. Seema Rasheed at Texas Pain on May 25, 2021, via telemedicine, for evaluation and treatment of low back pain that began in 2004 and worsened over time.  Pet. Ex. 48 at 12.  He had back pain every day, and he reported that was unable to work "secondary to the pain." Id.  Petitioner also complained of gastrointestinal issues and a rectocele, which "cause[d] him a lot of anxiety." Id.  Petitioner was diagnosed with lumbar radiculopathy, lumbar spondylosis, anxiety, lumbar degenerative disc disease, chronic pain disorder, and "[a]dmission for long-term opiate use." Id. at 12-13.  Petitioner reported that he had been taking Tylenol #3 "for some time" and it "seem[ed] to help the best." Id. at 13.  Petitioner reported that he was seeing a psychiatrist for his anxiety.  Id.  Bell's palsy was listed in Petitioner's past medical history, however there was no indication that Petitioner was experiencing any pain secondary to his history of Bell's palsy.  Id. at 12-14.

Petitioner returned to Texas Pain for follow-up and medication refills from July through November 2021.  Pet. Ex. 46 at 15-26.  At the visit on August 18, 2021, Petitioner reported seeing a psychologist[18] and psychiatrist weekly.  Id. at 19.  On September 13, Petitioner stated that he "continue[d] to have anxiety from the injection . . . which gave him Bell's palsy, and [he was] not interested in injections" as treatment for his back pain.  Id. at 21.  In October 2021, Petitioner stated that his back pain was "well controlled" with his current medication.  Id. at 23.

---

[18] Petitioner did not identify the psychologist who was treating him in 2021, and it does not appear he has produced records from that provider.

Petitioner also filed medical records from Texas Pain documenting his monthly visits from December 8, 2021 until November 30, 2022, for continued treatment of his chronic back pain.  Pet. Ex. 48 at 35-36; Pet. Ex. 56 at 1-23.  Assessments for these visits included lumbar radiculopathy, anxiety, chronic abdominal pain, lumbar spondylosis, lumbar degenerative disc disease, chronic pain disorder, and "[a]dmission for long-term opiate use."  Pet. Ex. 56 at 1, 3, 5, 7, 9, 12-14, 16, 18, 20, 22.  "Myofascial pain" was added under assessments on October 26, 2022 and was included in the assessments from the visit on November 30, 2022.  Id. at 20, 22.  During the period of treatment, Petitioner was prescribed acetaminophen with Codeine, Cyclobenzaprine, and Flexeril for treatment of his back pain.  Id. at 1-23.  The records indicated that Petitioner underwent surgery for an abdominal hernia in February 2022.  Id. at 4.  There is no mention in these records to any pain or other residual effects from Bell's palsy.  See id. at 1-23.

### C.    Petitioner's Affidavits and Declarations

Petitioner's first affidavit was executed on December 12, 2017.  Pet. Ex. 9 at 1.  In it, he averred that in the three years prior to his vaccination on October 2, 2014, "[he] was in good health and [] had not needed to see a health care provider."  Id. at ¶ 4.  He also stated that his last appointment with his neurologist Dr. Mukardamwala was on February 24, 2015, and that he had not seen any neurologist since that date.  Id. at ¶ 5.

In his second affidavit, executed on February 28, 2019, Petitioner averred that he received the hepatitis B vaccine at issue on Thursday, October 2, 2014.  Pet. Ex. 15 at ¶ 1.  Afterward, he experienced pain in his left arm where the vaccine was administered.  Id.  On the evening of October 2, he had "general malaise and soreness."  Id.  On Friday morning, October 3, 2014, he went to work, and opened the pharmacy where he worked.  Id. at ¶ 2.  His arm was sore, but otherwise, he was fine.  Id.  That afternoon, he began having a headache.  Id.  His headache continued and became severe, with "sharp piercing pain behind [his] left ear, and [his] left eye was mildly burning with flowing tears."  Id.  Although he wanted to stay out of work on Sunday, October 5, 2014, Petitioner had a mandatory drug inventory to complete so he went to work.  Id. at ¶ 3.  His pain, eye burning, and tearing continued.  Id.  When he arrived home after work, and looked in the mirror, he saw that his "face was deformed."  Id.  His left eye did not blink or close, his mouth could not hold water when he tried to brush his teeth, the left side of his face had no feeling, he was unable to chew food, and his mouth was drooping on the left side.  Id.  Petitioner "thought [he] was having a stroke," so he drove himself to an emergency room.  Id.

At the emergency room, Petitioner was given medication for his severe headache.  Pet. Ex. 15 at ¶ 4.  The "sharp piercing pain behind [his] left ear continued for [three to four] months" and did not respond to medical treatment, so Petitioner had a nerve block.  Id. at ¶ 5.  Petitioner also had numbness of his tongue for approximately six months.  Id.

As of the date that he executed the affidavit in 2019, Petitioner averred that he continued to "experience tightness and spasms in the left corner of [his] mouth, the left side of [his] face,

and the top of [his] left eye below [the] eyebrow." Pet. Ex. 15 at ¶ 6.  Petitioner also had fatigue and spasms of his left eye.  Id.  He avoided smiling because his smile was not symmetric.  Id.

He also averred that due to his Bell's palsy, he "developed chronic anxiety, depressive episodes, nightmares due to panic attacks at night, and chronic insomnia." Pet. Ex. 15 at ¶ 7.  He further alleged that he had been "diagnosed with PTSD and chronic insomnia," and that he saw a psychiatrist and took medication to treat these conditions.  Id.  Petitioner did not assert that he was unable to work due to his Bell's palsy, PTSD, chronic insomnia, or for any other reason.  See id. at ¶¶ 1-7.

On September 25, 2023, Petitioner executed his first declaration.  Pet. Ex. 67.  In it, he stated that following his vaccine injury in October 2014, he "was unable to return to work, so [he] applied for short term disability benefits through [his] employer." Id. at ¶ 2.  He submitted his application for short term benefits to Unum on October 7, 2014.  Id. at ¶ 3.  He used sick pay for one week and then Unum paid for three weeks of disability.  Id. at ¶ 4.  He filed an appeal, seeking a longer period of disability benefits, but his appeal was denied.  Id.

Petitioner executed his next declaration on December 4, 2023.  Pet. Ex. 68.  In it, Petitioner averred that after his vaccine injury, he "first used [] sick pay and then received benefits under an Unum policy for a short period of time." Id. at ¶ 2.  He returned to work in January 2015 due to his need to support his family, however, he was "still suffering facial pain and other symptoms." Id. at ¶ 3.  In January 2015, Petitioner had "been a pharmacist for 16 years and had worked at CVS since 2004." Id. at ¶ 4.  He had intended to stay with CVS until the end of his career.  Id.  But in 2015, he experienced stress at work.  Id. at ¶ 5.  The sound of the phone ringing at work hurt his affected ear and increased his anxiety.  Id. at ¶ 6.  And he felt that his anxiety made it difficult to "concentrate and remember" to the point that he felt it was "not safe . . . to be pharmacist." Id. at ¶ 6.  He quit working at CVS in March 2016 due to his concerns about safety, and to limit his interaction with people and noise, in order to "keep [his] stress level down." Id. at ¶¶ 7-8.  He "did not cover a shift and was terminated for not having [his] absence approved." Id. at ¶ 8.  The HR department at CVS informed him that he could reapply for his job and that he would be hired.  Id.  But Petitioner stated that he could not go back because he could not "take the anxiety and pain anymore." Id.  He felt that he "just [could not] take the stress of that job anymore" or do the work safely.  Id.

Regarding his low back pain, Petitioner averred that he has had back pain for years.  Pet. Ex. 68 at ¶ 9.  He had low back pain prior to his Bell's palsy and was able to work.  Id.  Petitioner stated that he "did not stop working as a pharmacist because of his back pain." Id.

Petitioner concluded the declaration by stating that his Bell's palsy has "caused [him] to suffer from [nightmares], insomnia[,] and depression." Pet. Ex. 68 at ¶ 10.  He also had a difficult time concentrating and remembering, and his symptoms were worsened by stress.  Id.

**D.    Petitioner's Employment Records**[19]

---

[19] Some of these records are difficult to read, especially the dates.

Petitioner's employment records show that he was hired as a pharmacist by CVS on August 1, 2004, and his last day of work was March 10, 2016.  Pet. Ex. 63 at 74, 132.  On March 11, 2016, he was suspended for taking leave, pending approval, and the following day, March 12, 2016, he was terminated for taking leave that was not approved.  Id. at 190.

Over the period of his employment, Petitioner took leave from work, primarily for health reasons.  Although the records are somewhat difficult to interpret, it appears that Petitioner took a leave of absence for health reasons on the following dates:

| Date Leave Taken | Date Returned to Work | Citation |
|---|---|---|
| November 3, 2004 | November 19, 2004 | Pet. Ex. 63 at 129-30, 186-87, 242-43 |
| August 17, 2010 | September 8, 2010 | Pet. Ex. 63 at 107-08, 166-67, 222-23 |
| May 21, 2013 | July 29, 2013 | Pet. Ex. 63 at 96-97, 155-56, 211-13 |
| May 6, 2014 | July 14, 2014 | Pet. Ex. 63 at 90-91, 149-50, 205-06 |
| October 6, 2014 (vaccination) | January 11, 2015 | Pet. Ex. 63 at 85, 88, 144, 147, 200, 203; Pet. Ex. 66 at 2 |

Petitioner took a leave of absence for health reasons at least four times prior to his vaccination.  In 2013, the year before his vaccination, it appears he took a two-month leave of absence for health reasons.  And again in 2014, prior to vaccination, Petitioner also took what appears to be a two-month leave for health reasons.

Beginning in 2013, Petitioner's records show a pattern of taking leave for health reasons without first obtaining approval, resulting in suspensions.  See Pet. Ex. 68 at 98, 157, 213 (May 21, 2013); Pet. Ex. 68 at 92, 151, 207 (May 6, 2014); Pet. Ex. 68 at 89, 148, 203-04 (October 6, 2014); Pet. Ex. 68 at 75, 134, 190-91 (March 11, 2016).  The last suspension resulted in his termination on March 12, 2016.  Id. at 74, 190.

### E.    Petitioner's Claim for Short Term Disability – Unum

On October 7, 2014, Petitioner filed a short-term disability claim for payment of lost wages with Unum.  Pet. Ex. 61 at 1.  Petitioner worked as a pharmacy manager, and his last day worked was October 5, 2014.  Id. at 3.  Benefits were approved through November 14, 2014.  Id. at 6.  After that date, the claim was "closed because there was no support for restrictions and limitations beyond this date."  Pet. Ex. 66 at 21.  His appeal was unsuccessful.  Id. at 22.

Regarding his disability[20] claims arising from Bell's palsy and neck pain, Unum stated that the records show that Petitioner "returned to work as of January 11, 2015, working 30 hours per week." Pet. Ex. 66 at 21. He reported that he was "experiencing panic attacks and depression" and noted that he was "taking Paxil 20 mg twice a day." Id. Unum obtained records from Dr. Qureshi (psychiatrist), Dr. Mukardamwala (neurologist), and Dr. Brandt Spies (chiropractor). Id. Based on a review of these records, the Unum representative, Teresa B. Ward, Lead Appeals Specialist, noted that Petitioner saw Dr. Spies on October 27, 2014. Id. On that date, "Dr. Spies noted [Petitioner] [was] going out of the country for family business." Id. Petitioner saw Dr. Mukardamwala on November 4, 2014, and Petitioner's "facial strength was better, the left nasolabial fold was reappearing, and [his] forehead wrinkling had improved. There was improvement in blinking on the left side. [Petitioner] also reported [that his] occipital neuralgia had resolved." Id. On November 14, Dr. Spies documented that Petitioner's "facial palsy had improved by 50%." Id. Thus, Unum concluded that the records did not support "restrictions and limitations due to Bell's palsy and neck pain" preventing Petitioner from "performing [his] regular occupation on a full time basis from November 14, 2014 and beyond." Id. at 22.

Petitioner also claimed short term disability related to anxiety. Pet. Ex. 66 at 22. Unum reviewed records from Dr. Mukardamwala and observed that Petitioner returned to work on January 11, 2015, for 30 hours per week, and that this supported a finding that Petitioner had the capacity to work. Id. Further, Unum found that "[t]here [was] no treatment provider(s) giving any restrictions and limitations due to a behavioral health condition." Id. Therefore, Unum concluded "there [was] no support for restrictions and limitations due to anxiety that preclude[d] [Petitioner] from performing [his] regular occupation on a full time basis from November 14, 2014, and beyond." Id.

### F. Social Security Evaluation in 2017 by Dr. Ron Kirkwood

On August 25, 2017, Petitioner underwent a disability determination services evaluation "regarding bulged/herniated disc at L4-L5[] [and] facial and eye nerve damage" by Dr. Ron Kirkwood at Immediate Medical Care. Pet. Ex. 14 at 2. Dr. Kirkwood summarized Petitioner's complaints, stating that Petitioner's primary complaint was "chronic back pain and neck pain. He suffer[ed] daily with pain in his whole spine; basically, from his cervical spine down to his lumbar spine . . . . He also ha[d] a complaint of problems with defecation due to an anal sphincter problem." Id. Although Petitioner had surgery, he had "frequent episodes of defecation where he [was] running to the bathroom all the time." Id. Dr. Kirkwood also documented that Petitioner "suffer[ed] from depression and [was] seeing a psychiatrist, and [PTSD] with generalized anxiety disorder as well." Id. In addition, Petitioner stated that he had "Bell's [p]alsy a few years ago and continue[d] to have some palsy on the left side of his face,

---

[20] Unum defined residual disability as being "limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and . . . a 20% or more loss in weekly earnings due to that same sickness or injury." Pet. Ex. 66 at 22-23. Material and substantial duties are those "normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." Id. at 23.

especially affecting his eye." Id.  Petitioner's other problems included benign thyroid nodules, hypertension, and "chronic pain syndrome." Id.

Physical examination revealed that Petitioner's visual acuity was "20/25 in the right eye, 20/20 if the left eye, and 20/20 in both eyes with correction."  Pet. Ex. 14 at 3.  His examination did not reveal any problems with hearing, understanding directions, gait, use of his iPhone, sitting, bending, or walking.  Id.  Petitioner did not use any assistive devices.  Id.  Examination of the head, eyes, ears, and nose was normal, although Petitioner was noted to have a palsy on the left side of his face.  Id.  Dr. Kirkwood's impression was chronic back and neck pain, problems with defecation, depression/PTSD, generalized anxiety disorder, "[h]istory of Bell's [p]alsy with a palsy on the left upper side of his face noted," thyroid nodules, hypertension with elevated blood pressure, chronic pain syndrome, and chronic use of pain medications.  Id. at 4-5.

A medical opinion questionnaire describing Petitioner's ability to perform activities was completed by Dr. Qureshi on July 21, 2018.  Pet. Ex. 14 at 6-8.  Dr. Qureshi rated Petitioner as fair in many activities, but in some, Petitioner was assessed as poor or none.  Id.  Dr. Qureshi added that Petitioner "has been very stressed due to his personal [and] medical health problems." Id. at 8.

## G.    Petitioner's 2018 Letter to the Social Security Disability Administration Department

Petitioner submitted his claim for Social Security Disability benefits with a letter dated March 21, 2018.  Pet. Ex. 12 at 1.  In his letter, Petitioner described that he had been without income "for the last two years due to multiple major health problems," that included "chronic lower and upper back problem, major anxiety and depression, spasms and pain from Bell's palsy[,] [] [and] pain and frequent bathroom use due to . . . surgery done in 2010."  Id.  He explained that he had "stopped work[ing] in March of 2016 when [his] conditions worsened and couldn't allow [him] to work without severe pain and suffering."  Id.

In the letter, Petitioner also explained that he was raising his daughter (then age 4 years and 9 months) as a single parent, and that she had developmental issues requiring "occupational, feeding[,] and speech therapies."  Pet. Ex. 12 at 1.  He had applied for Social Security Disability Benefits in 2017 and was awaiting a hearing.  Id.  He described his financial situation and the stress it was causing him.  Id.  He also recounted an admission to an emergency room on March 18, 2018, for "excruciating back and chest pain with severe spasms and extreme anxiety with [his] blood pressure [] to 180/122."  Id.

## H.    Unfavorable Notice of Social Security Decision June 5, 2019[21]

Petitioner first applied for Social Security Disability benefits on April 26, 2017, and his claim was denied on June 5, 2019.  Pet. Ex. 39.  The decision states that Petitioner alleged that

---

[21] The undersigned has reviewed the entire decision but summarizes only the most relevant portions for the sake of brevity.  The complete Social Security file is over 3000 pages.  See Pet. Ex. 64.

his disability began on March 11, 2016.  Id. at 4.  His claim was initially denied on September 14, 2017 and again on reconsideration on December 1, 2017.  Id.  After a written request for hearing, an evidentiary hearing was held May 2, 2019, where medical experts testified.  Id. Petitioner was represented by counsel.  Id.  After "careful consideration of all of the evidence," Vincent Bennett, Administrative Law Judge, found that Petitioner (claimant) "ha[d] not been under a disability . . . from March 11, 2016, through the date of [the] decision."  Id. at 5.

Regarding Bell's palsy, Judge Bennett noted that in October 2014, Petitioner/claimant "was unable to close his left eye fully and there was a slight numbness to both cheeks. Otherwise, motor function in the face was normal. . . .  He was diagnosed with Bell's palsy and migraine headache."  Pet. Ex. 39 at 7.  "In September 2015, the Bell's palsy had resolved."  Id. He concluded that "[w]hile there was evidence of recurrent[22] Bell's palsy in August 2017, there was no evidence of any ongoing complications."  Id.

The testimony of Dr. Albert Oguejiofor, an "impartial medical expert," established that "there were no exertional limitations related to Bell's palsy."  Pet. Ex. 39 at 8.  "Based on a preponderance of the evidence, [] [Petitioner's] claimant's hypertension, Bell's palsy, history of rectal surgery and migraine headaches [were] nonsevere.  A medically determinable impairment is not severe if it is only 'a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education, or work experience.'"  Id.

As for Petitioner's mental health condition, Dr. Ashok Khushalani, a board-certified psychiatrist, and impartial medical expert, testified.  Pet. Ex. 39 at 8.  "Dr. Khushalani summarized the objective medical evidence, noting that [] [Petitioner] claimant had been diagnosed with [PTSD], depression, anxiety[,] and panic disorder.  [] [H]e noted the record show[ed] consistent diagnoses of panic disorder and depression."  Id.  Dr. Khushalani testified however, that "the medical record [did] not substantiate the diagnosis of [PTSD]."  Id.  Further, Petitioner's/claimant's "mental impairments" did not constitute "as least one extreme or two marked limitations in a broad area of functioning" so as to satisfy the required criteria to show that he was unable to work.  Id. at 9.  "In written statements, [] [Petitioner] claimant reported he was able to care for his young daughter, prepare simple meals, wash and iron, perform light household chores, grocery shop, drive, watch television[,] and use the computer."  Id. Additionally, "[i]n August 2017, [] [Petitioner] claimant expressed he read the news on the telephone and periodical[s] covering pharmaceuticals to preserve the knowledge and education he obtained as well as researching trading and other opportunities in the hope of learning a new skill."  Id.  The records showed he "was able to provide information about his health, describe his work history, follow instructions from healthcare providers[,] and respond to questions from medical providers."[23]  Id.

---

[22] In August 2017, Petitioner underwent a medical examination for a Social Security Disability determination by Dr. Kirkwood, and he noted that Petitioner "continue[d] to have some palsy on the left side of his face," and that it affected his eye.  Pet. Ex. 14 at 2-5.

[23] For additional evaluation of Petitioner/claimant's mental health issues, see Pet. Ex. 39 at 9-10.

After "careful consideration of the entire record," Judge Bennett found that Petitioner was able to "make decisions, attend and concentrate for extended periods, [and] accept instructions and respond appropriately to changes in routine work settings." Pet. Ex. 39 at 10. Judge Bennett also described a psychological evaluation done August 14, 2017, wherein Petitioner/claimant exhibited "adequate remote memory, recent memory[,] and immediate memory. . . . He exhibited an adequate ability to make sound and responsive decisions. There was no evidence of impaired insight. Id. at 13.

## I.    Partially Favorable Notice of Social Security Decision June 28, 2023

In this decision, Administrative Law Judge, Donald J. Wiley, found Petitioner/claimant disabled as of December 31, 2022, "the date last insured." Pet. Ex. 62 at 7.

Petitioner filed his second claim for disability benefits on July 16, 2020. Pet. Ex. 62 at 4. It was initially denied and denied again on reconsideration. Id. A hearing was held on May 15, 2023, and two medical experts testified. Id. Upon advice of counsel, Petitioner/claimant requested an amendment of his date of disability to January 31, 2020. Id.

Regarding Petitioner's allegations related to Bell's palsy, Judge Wiley stated that "the record reveals that [] [Petitioner] claimant has a history of left facial palsy after receiving a hepatitis B vaccination in October 2014. As a result, he underwent changes in appearance and function of facial muscles." Pet. Ex. 62 at 10. Petitioner reported in January 2023 "that the facial palsy, through symptoms such as head and neck pain as well as change in appearance, had impaired him to the point that he did not have any meaningful ability to function socially or occupationally." Id. Judge Wiley concluded that "[n]evertheless, based upon the records, there [was] no indication of any long-lasting effects of the use of his mouth or opening/closing of the eyelids. His pain complaints [were] treated conservatively." Id.

As for Petitioner's mental health issues, including allegations of anxiety, depression, and PTSD, Judge Wiley reviewed and summarized all relevant records, including records from 2020 through 2022, and evidence from the experts. Pet. Ex. 62 at 14-15. Judge Wiley concluded that "the intensity, persistence[,] and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record." Id. at 15. Moreover, "[i]f an impairment can reasonably be controlled by medication or treatment, it cannot serve as a basis for a finding of disability."[24] Id.

Petitioner "state[d] his primary issue [was] anxiety but he also attributed problems to the residuals of the Bell's [p]alsy." Pet. Ex. 62 at 16. Dr. Tariq indicated Petitioner "ha[d] a 'permanent' disability due to major depression and [PTSD]. In February 2023, Dr. Tari[q]

---

[24] This regulation states that "[i]n order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work. . . . If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." 20 CFR § 404.1530(a)-(b). Acceptable reasons for failure to follow prescribed treatment were also provided. See id. at § 404.1530(c).

assessed that [] [Petitioner] claimant had a marked impairment in social and occupational functioning and was not able to perform meaningful vocational duties in any capacity." Id. However, Judge Wiley found this assessment "not supported by the objective evidence of record, especially Dr. Tari[q]'s progress notes." Id. The records indicated Petitioner's "mental symptoms [were] controlled with medication and psychotherapy" and he "interact[ed] daily with his family and [did] not allege any problems with interaction with family members." Id. "He limit[ed] interactions with the public, primarily related to his disfigurement with Bell's [p]alsy. Consequently, those opinions are not persuasive." Id.

However, because Petitioner was "an individual of advanced age" as of December 31, 2022, along with the opinions and findings of the vocational experts, and application of applicable rules, Judge Wiley concluded that Petitioner was "disabled" as of that date, but not before then. Pet. Ex. 62 at 22.

## J.      Expert Reports and Medical Literature

In the entitlement phase of litigation, the parties offered expert opinions as to causation. Petitioner retained Dr. Vera S. Byers as an expert in immunology. Dr. Byers did not offer any opinion relevant to the psychological impact of Bell's palsy or the issue of lost wages. Petitioner's other expert, Dr. Marcel Kinsbourne, set forth opinions briefly summarized below. Respondent's experts, Dr. Subramaniam Sriram and Dr. Harry W. Schroeder, Jr., did not opine as to whether Petitioner's Bell's palsy impacted his ability to work.[25]

Dr. Kinsbourne opined that Petitioner's hepatitis B vaccine caused his Bell's palsy, and that his residual effects and psychological problems are sequelae of his injury. Pet. Ex. 16 at 6. Dr. Kinsbourne opined that the first manifestation of Petitioner's Bell's palsy was the left-sided postauricular headache that he experienced the day after vaccination. Id. at 4. The following day, Petitioner had "facial muscle weakness." Id. While Petitioner's palsy resolved, Dr. Kinsbourne explained that the long-term sequalae included abnormal movements of the left side of his face ("synkinesis") and left eyelid closure with voluntary contraction of the left-sided facial muscles. Id. Synkinesis "is attributed to aberrant reinnervation of the facial muscles during recovery" from Bell's palsy. Id.

In his affidavit, Petitioner described the psychological distress that he had experienced due to his Bell's palsy. See Pet. Ex. 15. Dr. Kinsbourne stated that the medical literature is replete with articles about "the psychological impact of facial palsies." Pet. Ex. 16 at 5. He cited Baugh et al.,[26] who noted that "patients with facial paralysis experience psychosocial dysfunction and diminished quality of life as a result of their appearance." Id. at 6 (citing Pet. Ex. 43 at 21).

Baugh et al. noted that while Bell's palsy is usually "self-limited," some patients may have "long-term poor outcomes" that "can be devastating to the patient." Pet. Ex. 43 at 2. "Most

---

[25] For a description of the experts' opinions, see Ruling on Entitlement, at 6-18.

[26] D.F. Baugh et al., Clinical Practice Guideline: Bell's Palsy, 149 Otolaryngology Head & Neck Surgery S1 (2013).

patients with Bell's palsy show some recovery without intervention within [two] to [three] weeks after onset of symptoms and completely recover within [three] to [four] months." Id. at 3.  Those who have "diminished facial movement and marked facial asymmetry, [and] . . . facial paralysis[,] can have impaired interpersonal relationships and may experience profound social distress, depression, and social alienation." Id. at 3-4.  There are many different procedures that can "normalize facial appearance." Id. at 4.

Fu et al.[27] stated that even when the paralysis of Bell's palsy resolves, patients who have disfigurement may have ongoing "social and psychological problems." Pet. Ex. 18 at 5.  These may include "greater levels of anxiety, depression, maladaptive behaviors, and reduced emotional well-being." Id. at 1.  Fu et al. studied 103 patients with facial palsy, using a questionnaire[28] to self-report measures of psychological distress using the Hospital Anxiety Depression Scale ("HADS")[29] to assess anxiety and depression.  Id.  The severity of facial palsy was determined based on the House-Brackmann scale, which grades the degree of paralysis on a scale of one to six, with one being normal and six indicating complete paralysis.  Id. at 3.  "[A] significant proportion" of the patients experienced psychological distress due to their facial palsy.  Id. at 4.  About one-third had depression, with eleven assessed as moderately depressed.  Id. at 3, 3 tbl.1.  Also, about one-third had anxiety, with eleven having moderate anxiety.  Id. at 3.  The study did not examine the effect of Bell's palsy, or its psychological distress, on the participants' ability to work or any adverse effects on employment.  See id. at 1-5.

Dr. Kinsbourne opined that there can be social and psychological problems associated with Bell's palsy.  Pet. Ex. 16 at 3, 6.  He opined that Petitioner had not been able to work due to his health issues and that "[h]is residual deficits and [] continuing psychological adversities are sequelae of the vaccine injury." Id.

---

[27] L. Fu et al., Psychological Distress in People with Disfigurement from Facial Palsy, 25 Eye 1322 (2011).

[28] The questionnaire used was the Illness Perception Questionnaire-Revised (IPQ-R).  Pet. Ex. 18 at 1.  "The Illness Perception Questionnaire-Revised (IPQ-R) assesses patients' beliefs about their condition and includes 14 items that assess symptoms (identity).  There are eight subscales: identity, timeline, causes, consequences, personal control, treatment control, illness coherence (patient's understanding of their illness), and emotional representation.  The timeline dimension is further divided into an acute/chronic/cyclical subscale." Id. at 2.

[29] "The Hospital Anxiety and Depression Scale (HADS) consists of a 14-item scale (two seven-item subscales).  The total score for each subscale ranges from 0 to 21. . . .  The HADS has been well validated and is commonly used to screen patients with a medical illness.  It excludes somatic symptoms of anxiety and depression, which may overlap with the physical illness." Pet. Ex. 18 at 2.

## V.    PARTIES' CONTENTIONS

### A.    Petitioner's Position

Petitioner asserts that "[a]s a result of [his] Bell's palsy, [he] developed an anxiety disorder and ultimately PTSD." Pet. Memo. at 1. Petitioner "attempted to continue work, but his mental health issues became worse over time. Eventually, in March of 2016, because of his mental health issues, [Petitioner] was unable to safely continue to work as a pharmacist." Id. at 1-2. Petitioner argues that his "loss of earning capacity is directly related to his vaccine injury," and as such, he seeks compensation for lost wages. Id. at 2.

In support of his argument, Petitioner provided a summary of his medical records, stating that after he was diagnosed with Bell's palsy, he reported to his neurologist on January 5, 2015, that he was having panic attacks at night. Pet. Memo. at 3 (citing Pet. Ex. 3 at 7). Medication helped, "but made him drowsy." Id. (citing Pet. Ex. 3 at 7). When he quit taking the medication, the nightmares returned. Id. (citing Pet. Ex. 3 at 8). Petitioner was referred to Dr. Qureshi, a psychiatrist. Id. (citing Pet. Ex. 3 at 8). At the initial visit with Dr. Qureshi on March 11, 2015, Petitioner reported his history of becoming anxious and depressed after he had Bell's palsy. Id. at 2-3 (citing Pet. Ex. 6 at 4). He also recounted his problems with nightmares and flashbacks. Id. at 3 (citing Pet. Ex. 6 at 4).

Petitioner also cites the opinion letters from Dr. Tariq in support of his claim for lost wages. Pet. Memo. at 3-4 (citing Pet. Ex. 57 at 1-2); see also Pet. Ex. 58 at 1-2. Petitioner was under Dr. Tariq's care since 2021, and Dr. Tariq performed an evaluation in January 2023. Pet. Memo. at 3 (citing Pet. Ex. 57). In his opinion letter, Dr. Tariq noted that in March 2015, Petitioner presented with "progressively worsening symptoms of mood and anxiety" and "was diagnosed with Generalized Anxiety Disorder and Major Depressive Disorder." Id. (quoting Pet. Ex. 57 at 1). Then in April 2017, Petitioner was diagnosed with PTSD. Id. (citing Pet. Ex. 57 at 1). Petitioner asserts that Dr. Tariq opined that Petitioner's "mental health issues [were] directly related to his vaccine injury.'" Id. at 3-4 (quoting Pet. Ex. 57 at 2). Dr. Tariq stated, "it is my [] opinion that the facial palsy subsequent to [h]epatitis B vaccination in October of 2014 is the most important predisposing and precipitating factor in the etiology of [Petitioner's] current psychiatric symptoms." Id. at 4 (quoting Pet. Ex. 57 at 2).

Further, Petitioner asserts that he "lost several weeks [of] work because of the initial physical challenges and pain" but that he "returned to work as soon as he was physically able as he was the sole financial provider for his family. He worked throughout 2015." Pet. Memo. at 4 (citing Pet. Ex. 68 at 1). Over time, Petitioner found it became more difficult to "safely operate as a pharmacist." Id. at 5 (citing Pet. Ex. 68 at 2). He "separated from his job on March 11, 2016," and although "[h]e ha[d] been approached by pharmacies to come back to work, . . . he [could not] handle the stress and . . . do the work safely due to his concentration and memory issues." Id.

Next, Petitioner cites the Social Security Disability decisions in support of an award for loss of wages. Pet. Memo. at 5-7. Petitioner first applied for benefits in 2017, and the decision issued June 5, 2019, "finding that [Petitioner] did not suffer from a disability as defined by the

Social Security Act."  Id. at 5-6 (citing Pet. Ex. 39 at 18).  Petitioner argues, however, that the Social Security Administrative Law Judge found that he was unable to work as a pharmacist due to anxiety and depression, due to his impaired "ability to deal with stressors, particularly people. Accordingly, the residual functional capacity limits the claimant to occasional contact with the general public to reflect this limitation."  Id. at 6-7 (quoting Pet. Ex. 39 at 16).  Therefore, Petitioner notes the decision resulted in a determination that he was "unable to perform past relevant work as actually or generally performed," but finding that he could perform other jobs such as "general office clerk" and "shipping clerk."  Id. at 7 (quoting Pet. Ex. 39 at 16-17).

In 2020, Petitioner filed his second application for Social Security Disability benefits, claiming an onset of disability of January 31, 2020, on advice of counsel.  Pet. Memo. at 7 (citing Pet. Ex. 62).  A hearing was held in May 2023, and a decision issued on June 28, 2023, partially favorable to Petitioner.  Id. at 8.  The Administrative Law Judge found Petitioner disabled as of December 31, 2022, the date on which he was last insured.  Id. (citing Pet. Ex. 62 at 7).  As of December 31, 2022, Petitioner was 54 years and five months, and thus, he was found to be disabled by virtue of his "advanced age."  Id. at 9 (citing Pet. Ex. 62 at 1, 22).

Based on the two decisions issued by the Social Security Administration, Petitioner argues that he "could not function as a pharmacist because of the anxiety produced by Bell's palsy."  Pet. Memo. at 10.  Petitioner also asserts that his "loss of employment as a pharmacist was directly linked to his Bell's palsy."  Id.  Even assuming that Petitioner could perform the jobs enumerated in the Social Security decisions (general office clerk, shipping checker, etc.), "[t]hese jobs pay significantly less than a pharmacist position."  Id. at 11.

Petitioner agrees that the question here is "whether [Petitioner] has suffered an impairment in his earning capacity because of his vaccine-related injury[,] . . .Bell's palsy, [and] its residual effects and complications."  Pet. Memo. at 9.  He states that he must show that the injury, and its effects and complications, are "a substantial factor leading to the loss."  Id. (citing Shyface v. Sec'y Health & Hum. Servs., 165 F.3d 1344, 1352 (Fed. Cir. 1999) ("We adopt the Restatement rule for purposes of determining vaccine injury, that an action is the 'legal cause' of harm if that action is a 'substantial factor' in bringing about the harm, and that the harm would not have occurred but for the action.").

In his reply brief, Petitioner suggests that Respondent "might be attempting to present an apportionment argument."  Pet. Reply at 2.  Petitioner states that the Federal Circuit has adopted the Restatement 2nd of Torts, citing Shyface, and quotes the pertinent provision.[30]  Id. (citing Shyface, 165 F.3d at 1352).  Assuming that Respondent is arguing that Petitioner's lost wages

---

[30] Section 433A "Apportionment of Harm to Causes" in the Restatement states, "(1) Damages for harm are to be apportioned among two or more causes where (a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm. (2) Damages for any other harm cannot be apportioned among two or more causes."

"might be apportioned between his proven vaccine injury and other, pre-existing conditions," Petitioner states that it is "Respondent's burden to prove such an apportionment."[31]  Id. at 3.

### B.      Respondent's Position

Respondent asserts "[i]t is [P]etitioner's burden under Section 11(e) of the Vaccine Act to prove the damages he is seeking" and he "has failed to prove by preponderant evidence that he is entitled to an award of lost earnings for his Bell's palsy injury."  Resp. Response at 3. Respondent noted a number of factors supporting his position.

First, Respondent noted Petitioner did not return to see his neurologist for his Bell's palsy after November 2021.  Resp. Response at 3.

Next, regarding the opinion letters from Dr. Tariq, Petitioner's psychiatrist from 2021 to 2023, attributing the cause of Petitioner's inability to work to his Bell's palsy, Respondent suggests that "a more comprehensive review of the medical records reflects that [P]etitioner has . . . other health conditions and has attributed his other medical ailments to his alleged inability to work in the past."  Resp. Response at 4.  For example, Respondent cites a letter written by Petitioner on March 21, 2018, to the Social Security Administration, stating that he suffered from "chronic lower and upper back problem[s], major anxiety and depression, spasms and pain from Bell's palsy, [s]pasms, pain and frequent bathroom use due to colorectal Sphincter pressure despite . . . surgery done in 2010."  Id. (quoting Pet. Ex. 12 at 1).  Petitioner reported back pain since 2004, and "used to be a pharmacist but [could not] work secondary to the pain. . . .  [H]e also had some [gastrointestinal] issues and ha[d] a rectocele, which also cause[d] him a lot of anxiety."  Id. (quoting Pet. Ex. 48 at 1) (citing Pet. Ex. 49 at 3; Pet. Ex. 14 at 2).

As for Petitioner's Social Security Disability finding in favor of awarding benefits, Respondent states that it was not based on Petitioner's Bell's palsy but on Petitioner's many medical conditions, including "degenerative disc disease . . . , hernia, Bell's palsy, depression, and anxiety."  Resp. Response at 4 (citing Pet. Ex. 62 at 9).  Moreover, Petitioner's successful Social Security Disability Application alleges his date of disability was January 31, 2020, over

---

[31] Section 433B "Burden of Proof" in the Restatement states, (1) Except as stated in Subsections (2) and (3), the burden of proof that the tortious conduct of the defendant has caused the harm to the plaintiff is upon the plaintiff.  (2) Where the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor.  (3) Where the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm."  See also Walther v. Sec'y of Health & Hum. Servs., 485 F.3d 1146, 1151 (Fed. Cir. 2007) ("[F]or purposes of the causation analysis the petitioner is treated as the equivalent of the tort plaintiff and the government is treated as the equivalent of the tort defendant. . . .  Thus, applying the Restatement to the Vaccine Act context, the petitioner generally has the burden on causation, but when there are multiple independent potential causes, the government has the burden to prove that the covered vaccine did not cause the harm.").

five years after the vaccination at issue.  Id. at 4-5.  And the Social Security Administration found that Petitioner was not disabled until December 31, 2022, (at age 54 years and 5 months) and only then because he met the requirement of "advanced age."  Id. at 5, 5 n.5 (citing Pet. Ex. 62 at 4-5, 22-23; Pet. Memo. at 9).

Specific to Bell's palsy, Respondent notes the Social Security Administration found there was "no indication of any long-lasting effects of the use of his mouth or opening/closing of eyelids."  Resp. Response at 5 (quoting Pet. Ex. 62 at 10).  Further, "there [was] no mention (medical evidence) [of Bell's palsy] since January 2020 and [] no indication of any residuals from it."  Id. (quoting Pet. Ex. 62 at 12).  An impartial medical expert who provided testimony at the disability hearing concluded "there [was] no diagnosis of a traumatic disorder in the treatment records."  Id. (quoting Pet. Ex. 62 at 11, 16).  Respondent concludes that the Social Security Disability determination "is not dispositive on this proceeding and objectively, [P]etitioner has ailments other than Bell's palsy that have interfered with his ability to work."  Id.

## VI.   LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000."  § 15(a)(4).  Additionally, compensation shall also include

> [a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses which
> > (i) result from the vaccine-related injury for which the [P]etitioner seeks compensation,
> > (ii) have been or will be incurred by or on behalf of the person who suffered such injury, and
> > (iii)(I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
> > (II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

Relevant to lost wages, the Vaccine Act provides that "[i]n the case of any person who has sustained a vaccine-related injury after attaining the age of 18 and whose earning capacity is or has been impaired by reasons of such person's vaccine-related injury for which compensation is to be awarded, compensation for actual and anticipated loss of earnings determined in accordance with generally recognized actuarial principles and projections."  § 15(a)(3)(A).  Such calculations must be undertaken in a "cautious manner."  Brown v. Sec'y of Health & Hum. Servs., No. 00-0182V, 2005 WL 2659073, at *6 (Fed. Cl. Spec. Mstr. Sept. 21, 2005).

Petitioner bears the burden of proof, by preponderant evidence, with respect to each element of compensation requested. <u>Brewer v. Sec'y Health & Hum. Servs.</u>, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); <u>see also</u> § 13(a)(1)(A). Further, compensation for anticipated loss of earnings may not be based on speculation. <u>J.T. v. Sec'y of Health & Hum. Servs.</u>, No. 12-618V, 2015 WL 5954352, at *7 (Fed. Cl. Spec. Mstr. Sept. 17, 2015) (noting § 15(a)(3)(A) "does not envision that 'anticipated loss of earnings' includes speculation"), <u>mot. for rev. den'd</u>, 125 Fed. Cl. 164 (2016). Failure to provide preponderant evidence to support a finding that a petitioner's earning capacity has been impaired because of a vaccine injury or such a claim based on speculation without preponderant evidence will result in denial of a lost wage claim. <u>See Dillenbeck v. Sec'y Health & Hum. Servs.</u>, No. 17-428V, 2019 WL 4072069, at *12-13 (Fed. Cl. Spec. Mstr. July 29, 2019), <u>aff'd in part and remanded</u>, 147 Fed. Cl. 131 (2020).

Substantively, claims of past lost wages require examination of circumstances under which lost wages arose. Where a petitioner has been terminated from a position, weighing evidence for past lost wages considers whether a petitioner could have reasonably expected to continue work in the same manner and position but for the vaccine injury. <u>See Dillenbeck</u>, 2019 WL 4072069 at *10-11. Documentation through medical records, release to work documents from physicians, and the nature of the job are useful in this determination. <u>See id.</u> at *9-12. If a petitioner has returned to work after a vaccine injury, claims for lost wages arising from a differential in pay must be due to the vaccine injury, such as physical limitations requiring a change in type of work. <u>See id.</u> at *10-13.

Claims of future lost wages require additional examination of the length of time a petitioner could be reasonably expected to work beyond the present day. Factors independent of and dependent on the petitioner should be considered in the particulars of the situation. In <u>Dillenbeck</u>, changes in licensing law, petitioner's performance reviews prior to the vaccine injury, and petitioner's actual ability to secure a similar position contributed to the determination of whether a petitioner could have maintained a position into the future indefinitely. <u>See Dillenbeck</u>, 2019 WL 4072069 at *12 (denying future lost wages based on petitioner's lack of license required by a change in law for her past position, several negative performance reviews in her past position, and displayed ability to work and secure similar paying positions after her vaccine injury).

Evidence to support claims of past and future lost wages includes documentation of wages affected by the vaccine injury such as income, tax, or benefit documents. Documentation of unpaid time, leave, or reductions in salary are expected in establishing a claim of lost wages. <u>See, e.g.</u>, <u>Bruegging v. Sec'y Health & Hum. Servs.</u>, No. 17-0261V, 2019 WL 2620957, at *10 (Fed. Cl. Spec. Mstr. May 13, 2019); <u>Dillenbeck</u>, 2019 WL 4072069 at *110-13.

Furthermore, speculation around planned future endeavors should not be used in determining a petitioner's claim of future lost wages. <u>J.T.</u>, 2015 WL 5954352, at *7, *10-12 (denying speculative future lost wages based on petitioner's claim that his vaccine injury prevented him from starting a new professional endeavor he planned to undertake). This informs the notion that determinations for lost wages must be based on the general work life expectancy of an uninjured individual, not the petitioner's expectancy. <u>Brewer</u>, 1996 WL 147722, at *25

(citing Edgar v. Sec'y Health & Hum. Servs., 989 F.2d 473 (Fed. Cir. 1993)).  Basing claims of future wages on a petitioner's own expectancies that differ from the generally accepted work life expectancy of an individual would likely be speculative, and not calculated in a "cautious manner."  Brown, 2005 WL 2659073, at *6.

## VII.   ANALYSIS

Petitioner seeks an award for loss of earnings from the onset of his Bell's palsy to present.  While the undersigned finds there is not preponderant evidence to support such an award, there is preponderant evidence of lost wages for a brief period after the onset of Petitioner's vaccine related condition.

### A.   Petitioner Is Entitled to Compensation for Loss of Earnings from October 6, 2014 to October 17, 2014

The undersigned finds that Petitioner has proven by preponderant evidence that his Bell's palsy resulted in his inability to work from October 6[32] until October 17, 2014.  This finding is based on the contemporaneous medical records by Petitioner's neurologist, Dr. Mukardamwala.

The contemporaneous records show that Petitioner received the vaccination at issue on October 2, 2014.  On October 4, he was unable to close his left eye and had left-sided facial numbness.  He was diagnosed with Bell's palsy.  Upon request, Dr. Mukardamwala signed Petitioner's leave from work form.  On October 17, Petitioner returned to see Dr. Mukardamwala, who noted that Petitioner was gradually improving.  Dr. Mukardamwala's assessment included anxiety.  Dr. Mukardamwala told Petitioner that his symptoms were improving, and Petitioner was instructed that "he may return to work."  Pet. Ex. 3 at 4.

It is reasonable to interpret Dr. Mukardamwala's records summarized above to show that Petitioner's ability to work as a pharmacist was impaired during his acute symptoms of Bell's palsy.  On October 17, however, Dr. Mukardamwala found that Petitioner was improved and could return to work.  Dr. Mukardamwala also assessed Petitioner with anxiety on that date.  However, it is reasonable to find that Dr. Mukardamwala's diagnosis of anxiety did not impair Petitioner's ability to work, since he instructed Petitioner that he could return to work.

There is no evidence from any other contemporaneous health care provider during this time frame documenting that Petitioner was unable to work due to his Bell's palsy, or his anxiety, panic attacks, or PTSD.  Petitioner's treating neurologist assessed Petitioner's condition and specifically opined that Petitioner was gradually improving and that he could return to work on October 17, 2014.  There is no other contemporaneous evidence cited by Petitioner, or included in Petitioner's contemporaneous records, to show that any health care provider opined that Petitioner was not able to work after October 17, 2014.

---

[32] Although he was experiencing the acute symptoms of Bell's palsy, Petitioner worked on October 4, 2014 and October 5, 2014.  See Pet. Ex. 15 at ¶¶ 2-3.  Therefore, the undersigned uses the date of October 6 as the beginning date that he was unable to work.

Medical records, specifically contemporaneous medical records, are presumed to be accurate and generally "warrant consideration as trustworthy evidence." Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993). Greater weight is typically given to contemporaneous records. Vergara v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."). The weight afforded to contemporaneous records is due to the fact that they "contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium." Cucuras, 993 F.2d at 1528.

The undersigned notes that her finding of Petitioner's impaired ability to work is shorter than the time frame of disability found by Petitioner's short term disability carrier, Unum. On October 7, 2014, Petitioner filed a claim with Unum. His last day of work was October 5, and benefits were approved through November 14, 2014. After that, the claim was "closed because there was no support for restrictions and limitations beyond that date." Pet. Ex. 66 at 21.

Unum's records show that Dr. Mukardamwala documented that Petitioner's Bell's palsy was improved by November 4, 2014. And Unum noted that Petitioner's chiropractor documented that on November 14, 2014, Petitioner's Bell's palsy was improved by 50%. Unum concluded that the records did not support "restrictions and limitations due to Bell's palsy and neck pain" that prevented Petitioner from "performing [his] regular occupation on a full time basis" after November 14, 2014. Pet. Ex. 66 at 22. The reasons for Unum's decision to extended benefits beyond October 17 to November 14, 2014 are not known. Regardless, the undersigned is not bound by Unum's findings. See Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999).

Moreover, the undersigned finds the contemporaneous medical records of Dr. Mukardamwala to be more persuasive than the conclusions reached by Unum. Dr. Mukardamwala was Petitioner's treating neurologist, who examined and evaluated Petitioner, and who had specialized knowledge in treating patients with Bell's palsy and its residual effects. Further, Dr. Mukardamwala evaluated Petitioner and specifically found that Petitioner could return to work on October 17, 2014.

### B.   Petitioner Has Not Shown by Preponderant Evidence That His Bell's Palsy or Any Residual Effects Resulted in an Inability to Work After October 17, 2014

As described above, Dr. Mukardamwala found that Petitioner could return to work on October 17, 2014. Petitioner next saw Dr. Mukardamwala November 4, 2014. At that visit, Petitioner reported that since receiving a nerve block at the prior visit, "his pain [was] better." Pet. Ex. 3 at 6. He also reported improvement in his other symptoms. Physical examination confirmed improvement. There is no indication in the note on November 4, 2014 that Petitioner was unable to work as a pharmacist.

Petitioner returned to see Dr. Mukardamwala on January 5, 2015.  At that visit, he reported that he began having panic attacks before his last visit (November 4, 2014).  He also reported being anxious, depressed, and angry.  Dr. Mukardamwala's assessment was "[l]eft Bell's palsy," "[p]ossible anxiety/panic attacks," "[i]nsomnia," and "[n]ightmares - ? [p]arasomnia."  Pet. Ex. 3 at 7.  However, Dr. Mukardamwala did not opine or state that Petitioner's anxiety/panic episodes, insomnia, depression, or anxiety were caused by Petitioner's Bell's palsy, or that these conditions were secondary to Bell's palsy, or residual effects of Bell's palsy.  Even assuming that Petitioner's anxiety/panic episodes, insomnia, depression, and anxiety were the sequelae of his Bell's palsy, Dr. Mukardamwala did not suggest that Petitioner was unable to work due to these problems.

At the visit on January 5, 2015, Petitioner told Dr. Mukardamwala that he had not yet returned to work, but that he wanted to "go back to work with shorter shifts."  Pet. Ex. 3 at 7.  Dr. Mukardamwala provided the requisite paperwork so that Petitioner could work eight-hour shifts, as opposed to longer shifts.[33]  The record from this visit evidences Petitioner's desire to return to work.  There is no indication from the record that either Dr. Mukardamwala or Petitioner thought Petitioner could not or should not return to work, or work full-time, because of his Bell's palsy or because of any mental health or other condition.  Dr. Mukardamwala did not impose any restrictions or limitations on Petitioner's employment, other than he work no longer than eight hours per shift.  And Petitioner does not argue that an eight-hour shift limited his ability to work full-time.

Petitioner returned to work on January 11, 2015.  And he worked throughout all of 2015, and until March 2016 when he was terminated.  There is no medical record, doctor's note, or other contemporaneous record placing any limitations or restrictions on Petitioner's ability to work, other than the shift limit of eight hours by Dr. Mukardamwala on January 5, 2015.

On referral from Dr. Mukardamwala, Petitioner saw Dr. Qureshi, a psychiatrist, in March 2015.  Dr. Qureshi's note describes Petitioner's anxiety, depression, nightmares, and sleep disturbances.  Medication was prescribed to treat these conditions.  There is no documentation to suggest that Petitioner thought he was unable to work.  And Dr. Qureshi did not opine that Petitioner was unable to work or place any limitations or restrictions on his employment.

Dr. Qureshi saw Petitioner several times in 2015, and notes from each of the visits describe Petitioner's mental health conditions.  But again, there is no documented concern about Petitioner's ability to work or other evidence to suggest that Petitioner's mental health conditions impaired or limited his ability to work as a pharmacist.

Based on the contemporaneous evidence related to Petitioner's employment, his medical records, including the records of his treating neurologist and psychiatrist, the undersigned finds that Petitioner has failed to prove by preponderant evidence that he was unable to work after the

---

[33] CVS employment records show that there were months from 2004 forward where Petitioner's hours were variable.  Pet. Ex. 63 at 10-68.  Prior to his vaccination, the length of his shifts is not clear.

date that he was released to work by Dr. Mukardamwala on October 17, 2014, and from that day forward in 2014, and throughout all of 2015.

After October 5, 2014, Petitioner did not return to work until January 11, 2015. However, for all of the reasons described above, the undersigned finds that there is no evidence to support a finding that he was unable to work from October 17, 2014, until he did return on January 11, 2015.

The undersigned also finds that Petitioner's Bell's palsy and any residual effects of that condition did not prevent Petitioner from working in his professional capacity as a pharmacist in 2015. The records show that he did work as a pharmacist throughout all of 2015. And there is no contemporaneous evidence from his treating physicians in 2015 to show or suggest that Petitioner was unable to work or had any limitations or restrictions laced on his employment as a pharmacist.

Moving to 2016, Petitioner's employment records show that on March 12, 2016, he was terminated for taking leave that was not approved. Prior to termination, Petitioner had a pattern of taking leave for health reasons without first obtaining approval, resulting in suspensions. This occurred on May 21, 2013, May 6, 2014, October 6, 2014, and March 11, 2016, the last of which resulted in his termination. Petitioner's employment file does not include any documentation that would suggest he was terminated for medical or mental health reasons or because he was not able to perform his duties and responsibilities as a pharmacist.

Moreover, Petitioner saw Dr. Qureshi twice in 2016. On January 13, 2016, Petitioner reported feeling less anxious and depressed. There is no mention of any problems or concerns related to Petitioner's employment. At his next visit, on April 13, 2016, Petitioner reported that he was "doing fine." Pet. Ex. 8 at 8. He was "undergoing [a] jury trial for divorce," "stressed out financially[,] and [was] also taking care of his [two] year old daughter." Id. He was "angry and frustrated at his wife" who "initially ran away with his daughter. Id. However, his medications were working well. There is no mention that he had been terminated from his job. Petitioner did not return to see Dr. Qureshi, or anyone else at the practice for the remainder of 2016.

There is no contemporaneous evidence from 2016 establishing that Petitioner was unable to work as a pharmacist in 2016 due to his Bell's palsy, or his mental health conditions of anxiety, depression, panic attacks, nightmares, PTSD, or for any other reason. Therefore, the undersigned finds that Petitioner has failed to prove by preponderant evidence that he was unable to work in 2016 due to his Bell's palsy or mental health conditions. The undersigned also finds that the evidence shows that Petitioner's job was terminated due to his failure to obtain approval for leave, and not due to his Bell's palsy or any residual effects of his Bell's palsy.

Petitioner's Bell's palsy occurred in October 2014. His condition significantly improved over the course of the first year following his illness. He worked most of 2015, and part of 2016. He was terminated due to failure to obtain approval for leave, and not due to Bell's palsy, any residual effect of Bell's palsy, or any mental health conditions. He was under the care and treatment of a psychiatrist who provided regular evaluations and whose records do not document

any concerns about his ability to work as a pharmacist.  For these reasons, the undersigned finds that Petitioner has failed to provide preponderant evidence that he was unable to work in his capacity as a pharmacist in 2016.

Over time, it becomes increasingly difficult to associate Petitioner's Bell's palsy, and its sequalae, and Petitioner's mental health conditions, with his alleged inability to work as a pharmacist, especially given the difficult circumstances Petitioner faced in 2016, including going through a divorce, custody proceedings, and caring for a young daughter as a single parent.

Claims for past lost wages require examination of the circumstances under which the lost wages arose.  When a petitioner has been terminated from employment, weighing evidence of past lost wages includes an evaluation of documents from medical records and employment records to discern whether a petitioner could have reasonably expected to work in the same manner and position but for the vaccine injury.  See Dillenbeck, 2019 WL 4072069, at *10-13. Here, a thorough evaluation of the evidence establishes that Petitioner was released to return to work less than two weeks after his vaccine injury.  After that, he returned to work.  He was seen and treated regularly for his behavioral health issues and there is no suggestion that he was unable to work due to his Bell's palsy, or his behavioral health.

### C.    Evidence Created Later-in-Time Does Not Provide Persuasive Support for Petitioner's Claim of Lost Wages

In addition to contemporaneous records, Petitioner filed documents created later-in-time to support his claim for lost wages.  These include Petitioner's medical records from 2017 to 2023.  Petitioner's medical records show that he continued to see his psychiatrist for his mental health conditions, for follow-up evaluations, and medication adjustments.  The records include a few references to his prior episode to Bell's palsy; generally, these are statements made by Petitioner attributing his anxiety and other behavioral health conditions to his Bell's palsy.  But there are no statements or opinions by Petitioner's treating health care providers suggesting that Petitioner was unable to work due to his Bell's palsy or his mental health conditions.

These later records also show that Petitioner had ongoing and significant medical problems related to back pain, requiring treatment by pain management, and bowel urgency due to his prior rectal fistula and related surgery.  Petitioner also struggled as a single parent to care for his young daughter, and he had a difficult time during the Covid pandemic, especially since his daughter was at home and attended school at home in a remote classroom setting.  Overall, the later-in-time medical records establish that Petitioner experienced many challenges and difficult circumstances from 2017 to 2023.

The later records also include a remote telemedicine evaluation of Petitioner by Dr. Tariq on January 13, 2023 with a chief complaint of "legal evaluation."  Pet. Ex. 59 at 2 (emphasis omitted).  The purpose of the visit was for Dr. Tariq to perform a "legal evaluation" of Petitioner's current mental status.  Id. (emphasis omitted).  The evaluation was done "in the context of [Petitioner's] lawyers wanting to talk to supervising provider about patient's current mental status."  Id.  During the evaluation, Petitioner reported that his anxiety and other mental health problems were caused by his episode of Bell's palsy in 2014.  Id.  Dr. Tariq opined as to

Petitioner's diagnoses, which included depression, anxiety, and PTSD. Id. at 3. In the medical records documenting the evaluation, Dr. Tariq did not offer an opinion about whether Petitioner's Bell's palsy or its sequelae affected Petitioner's ability to work as a pharmacist. See id. at 2-4. Dr. Tariq also did not opine that more likely than not Petitioner's mental health conditions were the result of his Bell's palsy. See id.

Separate from the medical records, Petitioner filed two opinion letters (both dated February 2, 2023) from Dr. Tariq about the evaluation he performed on January 13, 2023. In the first letter, Dr. Tariq opined that Petitioner's vaccination and his subsequent Bell's palsy was "the most important predisposing and precipitating factor in the etiology" of Petitioner's psychiatric symptoms. Pet. Ex. 57 at 2. In the second letter, Dr. Tariq opined that at Petitioner's "current level of function[,] it was not possible for [him] to safely and adequately perform work duties as a [p]harmacist" or any "meaningful vocational duties in any capacity." Pet. Ex. 58 at 2.

The undersigned does not find Dr. Tariq's 2023 opinions to be persuasive for several reasons. First, the opinions of Dr. Tariq in January and February 2023 relate to Petitioner's "current mental status" which necessarily is over eight years after his episode of Bell's palsy. During that eight-year period, Petitioner went back to work for over one year, was terminated by CVS, was involved in custody and divorce proceedings, obtained custody of his young daughter, began taking care of his young daughter as a single parent, had progressive back pain requiring pain management treatment, had significant rectal sphincter problems, and experienced other health problems. The passage of time, as well as these life events, likely impacted Petitioner's mental and physical well-being. Therefore, Dr. Tariq's opinions based on Petitioner's current condition in 2023 are not relevant to the question of Petitioner's ability to work after his episode of Bell's palsy and its sequalae with an onset in October 2014.

Further, although Dr. Tariq may have been Petitioner's physician beginning in 2021, he did not have any personal knowledge or information about Petitioner prior to that time. Moreover, it is not clear that Dr. Tariq personally evaluated or examined Petitioner in 2021 and 2022. For example, on August 13, 2021, Petitioner was seen by Jayma Mickler, PAC. Although Dr. Tariq signed off as the supervising physician, it is not clear that he saw Petitioner. See Pet. Ex. 46 at 67-68. On November 9, 2021, Petitioner was seen by a different provider, and a different physician signed off as the supervising physician. See id. at 69-71. In 2022, Petitioner saw Jayma Mickler, PAC, four times, and Dr. Tariq signed off each visit, but again, it is not known whether Dr. Tariq ever saw Petitioner at these visits. See Pet. Ex. 55 at 2-14. The only time that the records show that Dr. Tariq personally evaluated Petitioner was the remote telemedicine interview in January 2023. See Pet. Ex. 57 at 1-2; Pet. Ex. 58 at 1-2; Pet. Ex. 59 at 2-4.

Another problem with Dr. Tariq's opinion letters is that they are inconsistent with his own medical records. None of Petitioner's records from Dr. Tariq's office in 2021 through 2022 document concerns about Petitioner's ability to work. Even in Dr. Tariq's medical record dated January 13, 2023, there is no assessment, evaluation, or reference to Petitioner's employment or inability to work. The medical record history does include Petitioner's report that "the facial palsy, through the symptoms it caused [] including head and neck pain, change in appearance etc. has impaired him to the point that he has no meaningful ability to function socially or

occupationally." Pet. Ex. 59 at 2.  However, Dr. Tariq does not state any opinion about whether Petitioner could work.  And Dr. Tariq's mental examination revealed that Petitioner's thought process was "[l]ogical and linear," his short- and long-term memory were normal, his attention span was normal, and insight and judgment were fair.  Id. at 3.

Dr. Tariq's opinions are also conclusory.  He did not document physical or mental examination findings, diagnostic or testing results, or other data to support a conclusion that Petitioner was not able to work.  Dr. Tariq did conduct an evaluation of Petitioner's depression, but he did not opine that Petitioner's depression prevented him from being employed.  Special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support."  Kreizenbeck v. Sec'y of Health & Hum. Servs., No. 08-209V, 2018 WL 3679843, at *31 (Fed. Cl. Spec. Mstr. June 22, 2018), mot. for rev. den'd, decision aff'd, 141 Fed. Cl. 138 (2018), aff'd, 945 F.3d 1362 (Fed. Cir. 2020).

Moreover, Dr. Tariq's opinion letters do not acknowledge the facts and circumstances of Petitioner's life over the prior eight years.  Dr. Tariq did not review employment records.  He did acknowledge that Petitioner had been terminated from employment for failing to obtain approval for leave.  He did not document or take into consideration that Petitioner had returned to work after his Bell's palsy episode.  He did not address the difficult circumstances of going through custody and divorce proceedings or being the single parent of a young daughter.  He did not reference Petitioner's chronic back pain, necessitating pain management.  He did not address Petitioner's other health problems, such as his issues with bowel urgency due to rectal sphincter problems.  And he did not consider how difficult the Covid pandemic was for Petitioner.

Generally, treating physician statements are typically "favored" as treating physicians "are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'"  Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1280 (Fed. Cir. 2005)).  However, no treating physician's views bind the special master, per se; rather, their views are carefully considered and evaluated.  § 13(b)(1); Snyder, 88 Fed. Cl. at 746 n.67.  "As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases."  Welch v. Sec'y of Health & Hum. Servs., No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019).  An opinion by a treating physician that is not supported by a factual basis or other evidence is conclusory in nature.  See Robertson v. Sec'y of Health & Hum. Servs., No. 18-554V, 2022 WL 17484980, at *17 (Fed. Cl. Spec. Mstr. Dec. 7, 2022); Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1347 (Fed. Cir. 2010).

Additionally, Dr. Tariq's opinions are less persuasive as they were not made contemporaneously and were prepared for the purposes of litigation.  See Zumwalt v. Sec'y of Health & Hum. Servs., No. 16-994V, 2019 WL 1953739, at *19 (Fed. Cl. Spec. Mstr. Mar. 21, 2019) (rejecting opinion from a treating provider when he presented an opinion two-and-one-half years after treatment and after litigation was initiated), mot. for rev. den'd, 146 Fed. Cl. 525 (2019); Vergara, 2014 WL 2795491, at *4 ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories,

affidavits, or trial testimony."); <u>Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs.</u>, 69 Fed. Cl. 775, 779 (2006) ("It is, of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight."); <u>Ricci v. Sec'y of Health & Hum. Servs.</u>, 101 Fed. Cl. 385, 391 (2011) ("Medical records from years later, merely chronicling a timeline between vaccination and injury, are not worthy of the same consideration as contemporaneous records.").

Regarding Petitioner's affidavits and declarations, particularly those statements related to his claim for lost wages, the undersigned generally finds these express Petitioner's view of his circumstances. Some of Petitioner's statements, however, are inconsistent with contemporaneous records, which diminishes their persuasive value. For example, in his initial affidavit executed in 2017, Petitioner averred that in the three years prior to vaccination on October 2, 2014, he was in "good health and [] had not needed to see a health care provider." Pet. Ex. 9 at ¶ 4. However, his employment records show that Petitioner took a two-month leave of absence for health reasons from May to July 2013, and another two months leave of absence for health reasons from May to July 2014.

Because Petitioner's affidavits and declarations are inconsistent with and contradicted by the contemporaneous medical records, it is reasonable to give greater weight to the contemporaneous medical records. <u>See</u> <u>Cucuras</u>, 993 F.2d at 1528 (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); <u>Doe/70 v. Sec'y of Health & Hum. Servs.</u>, 95 Fed. Cl. 598, 608 (2010); <u>Stevens v. Sec'y of Health & Hum. Servs.</u>, No. 90-221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990) (noting that "clear, cogent, and consistent testimony can overcome such missing or contradictory medical records"); <u>Vergara</u>, 2014 WL 2795491, at *4 ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."). This finding also extends to the lay witness affidavits and testimony. Other special masters have been faced with similar situations and found the contemporaneous medical records more persuasive than the affidavits and testimonies of lay witnesses. <u>See, e.g.</u>, <u>Rote v. Sec'y of Health & Hum. Servs.</u>, No. 90-036V, 1992 WL 165970, *5 (Cl. Ct. Spec. Mstr. July 1, 1992) (finding the lay witness testimony insufficient to overcome the weight of the contemporaneous medical records); <u>Bergman v. Sec'y of Health & Hum. Servs.</u>, No. 90-1252V, 1992 WL 78671, *4 (Cl. Ct. Spec. Mstr. Mar. 31, 1992) (same); <u>Daiza v. Sec'y of Health & Hum. Servs.</u>, No. 90-1188V, 1992 WL 59709, *4 (Cl. Ct. Spec. Mstr. Mar. 5, 1992) (same).

The undersigned finds that Petitioner's affidavit stating that he was in good health for the three years prior to his vaccination is inconsistent with his employment records which show that in both 2013 and 2014 (prior to vaccination), he took significant leave from employment for health reasons.

Further, Petitioner's employment records evidencing the fact that Petitioner took leave for medical reasons in both 2013 and 2014 calls into question Petitioner's baseline health and mental health condition prior to vaccination. While there is no suggestion that Petitioner had Bell's palsy prior to vaccination in any of his medical records, these extended leaves call into question the medical/mental health conditions which necessitated leave. They also call into

question whether Petitioner filed his complete pre-vaccination medical/mental health care records.

Lastly, Petitioner filed his relevant Social Security Administrative Disability Applications, filings, and decisions issued in 2019 and 2023. Both decisions were issued later in time than Petitioner's episode of Bell's palsy. As such, the findings and rulings issued in them do not reflect the events of 2014 or 2015, or speak to Petitioner's ability to work before, during, or after his Bell's palsy. See, e.g., Vergara, 2014 WL 2795491, at *4 ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony.").

Further, the Social Security decisions issued in 2019 and 2023 are not binding on the undersigned. Reinhardt v. Sec'y of Health & Hum. Servs., No. 17-1257V, 2022 WL 2303801, at *4, *7 (Fed. Cl. Spec. Mstr. Apr. 20, 2022) ("[D]ecisions of Social Security Administrative Law Judges are not binding on the special masters or judges of this federal court."). Nor is a "Social Security determination that [a petitioner] is disabled . . . binding on the undersigned." Perrin v. Sec'y of Health & Hum. Servs., No. 99-562V, 2004 WL 2830169, at *2 (Fed. Cl. Spec. Mstr. Nov. 22, 2004) (citing Tester Corp. v. U.S., 1 Cl. Ct. 370, 374-75 (1982) ("[I]t is a well settled principle that while administrative Board decisions concerning legal interpretations may be given some weight, they are clearly not binding on this court.")).

Although these decisions are not binding on the undersigned, they have been reviewed. In the 2019 decision, Judge Bennett denied Petitioner's application for disability benefits. Relevant to Bell's palsy, Judge Bennett noted that in October 2014, after his episode of Bell's palsy, Petitioner was unable to close his left eye fully, had numbness in his cheeks, but that otherwise, the motor function of his face was normal. Judge Bennett found that by September 2015, Petitioner's Bell's palsy had resolved. Judge Bennett also wrote that "there was evidence of recurrent Bell's palsy in August 2017,"[34] but "no evidence of any ongoing complications." Pet. Ex. 39 at 7.

During the Social Security hearing preceding the 2019 decision, Dr. Oguejiofor, an impartial medical expert, testified that Petitioner had "no exertional limitations related to Bell's palsy." Pet. Ex. 39 at 8. He also opined that Petitioner's Bell's palsy was not severe, and therefore it was not a "medically determinable impairment" that would be "expected to interfere with the individual's ability to work." Id. Dr. Khushalani, a board-certified psychiatrist and impartial medical expert, opined that Petitioner's "mental impairments" did not satisfy the required criteria to show that he was unable to work. Id. at 9.

Petitioner argues that Judge Bennett found that he was unable to work as a pharmacist due to anxiety and depression, causing his impaired "ability to deal with stressors, particularly people." Pet. Memo. at 6-7 (quoting Pet. Ex. 39 at 16). Petitioner specifically relies on

---

[34] Petitioner has not filed any medical records in this case that show that he had a recurrence of his Bell's palsy in 2017. It is not clear whether he was relying on Dr. Kirkwood's note that Petitioner "continue[d] to have some palsy on the left side of his face," and that it affected his eye. Pet. Ex. 14 at 2. However, Dr. Kirkwood did not classify this as a recurrence.

vocational testing that resulted in a determination that he was "unable to perform past relevant work as actually or generally performed," but finding that he could perform other jobs (general office, shipping clerk, etc.). Id. at 7 (quoting Pet. Ex. 39 at 16). This finding, according to Petitioner, supports a claim for the difference in what Petitioner could earn in those types of jobs as compared with his wages as a pharmacist.

The undersigned disagrees with Petitioner's interpretation. The 2019 decision found Petitioner had severe impairments including "degenerative disc disease of the lumbar spine[] [and] depression and anxiety." Pet. Ex. 39 at 7. However, the decision did not find that Petitioner's depression and anxiety were caused by his 2014 episode of Bell's palsy, or that his mental health alone resulted in his inability to perform past relevant work. More importantly, the objective of the finding was not to determine whether Petitioner could work as a pharmacist after his Bell's palsy episode in 2014, or his behavioral health issues that arose in late 2014 and 2015. And the decision specifically did not take into consideration the fact that Petitioner worked for over a year (January 2015 to March 2016) after his Bell's palsy episode, and after the onset of mental health conditions, or that he was able to work as a pharmacist while receiving medical and mental health treatment. Thus, the undersigned finds that any findings or rulings issued in the 2019 decision related to Petitioner's behavioral health issues which impacted his ability to work as a pharmacist are not applicable here.

The same problems apply to the Social Security decision issued in 2023, finding that Petitioner was disabled effective December 31, 2022. A finding of disability in 2022, eight years after Petitioner's Bell's palsy episode is too far removed from the relevant facts and circumstances, especially considering all the changes that occurred over that time frame in Petitioner's life which impacted his medical and mental health and well-being, as well as his ability to be employed as a pharmacist.

Lastly, in the entitlement phase of this case, Petitioner filed expert reports as to causation. The report by Dr. Kinsbourne touches on the issue of the residual effects of Petitioner's Bell's palsy. Dr. Kinsbourne cited several medical articles which shows that Bell's palsy can lead to psychological dysfunction, which can dimmish quality of life, impair interpersonal relationships, and lead to depression and anxiety. However, Dr. Kinsbourne's opinion that Petitioner was unable to work is not persuasive for the same reasons as Dr. Tariq's opinions. Dr. Kinsbourne's opinion is inconsistent with the records of Petitioner's contemporaneous treating physicians and it does not account for the facts, including the fact that Petitioner did return to work and worked for over a year before his termination. It is also conclusory. Like Dr. Tariq, Dr. Kinsbourne offered no physical or mental examination findings, diagnostic or testing results, or other data to support a conclusion that Petitioner was not able to work. Special masters consistently reject "conclusory expert statements that are not themselves backed up with reliable scientific support." Kreizenbeck, 2018 WL 3679843, at *31.

The undersigned does find, based on the contemporaneous medical records, Dr. Kinsbourne's expert opinion and the medical literature filed, which discussed the potential for patients with Bell's palsy to experience psychological dysfunction, including depression and anxiety, that these conditions can be considered in awarding compensation for Petitioner's pain and suffering and emotional distress. However, Petitioner has not proved by preponderant

evidence that his Bell's palsy, or its residual effects, impaired his ability to work as a pharmacist after October 17, 2014.

## VIII.   CONCLUSION

For all the reasons discussed above, the undersigned finds that Petitioner is entitled to past lost wages from October 6 through October 17, 2014.  Petitioner is not entitled to any other past or future loss of earnings.

The undersigned notes that this Ruling contains considerable discussion of Petitioner's mental health conditions.  Due to the nature of this information, Petitioner is encouraged to consider filing a motion to redact the case caption to his initials.[35]

Petitioner has filed several motions to obtain damage experts pending the outcome of this Ruling.  Given this Ruling, Petitioner's motions to appoint damages experts are **DENIED**.

Petitioner shall file a joint status report, **by Friday, July 26, 2024**, updating the Court on the parties' settlement discussions.  This status report shall provide a detailed update on each item of damages, indicating which items remain in dispute and how the parties are working toward resolution.

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master

---

[35] In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.