# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
Filed: October 20, 2025

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| A.B. | * | PUBLISHED |
| | * | |
| Petitioner, | * | No. 17-243V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Hepatitis B |
| AND HUMAN SERVICES, | * | ("Hep B") Vaccine; Bell's Palsy; Pain and |
| | * | Suffering; Lost Wages; Unreimbursable |
| Respondent. | * | Expenses. |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * | | |

Richard Gage, Richard Gage, P.C., Cheyenne, WY, for Petitioner.
Colleen Clemons Hartley, U.S. Department of Justice, Washington, DC, for Respondent.

## DAMAGES DECISION[1]

On February 21, 2017, A.B. ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2]  Petitioner alleged he suffered from Bell's palsy as the result of a hepatitis B ("Hep B") vaccination he received on October 2, 2014.  Petition at 1 (ECF No. 1). On September 20, 2021, the undersigned issued a Ruling on Entitlement, finding Petitioner entitled to compensation.  Ruling on Entitlement dated Sept. 20, 2021 (ECF No. 75).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services).  **This means the Decision will be available to anyone with access to the Internet.**  In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy.  If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018).  All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

Since that ruling, the parties have been in the damages phase of litigation and have been unable to resolve the appropriate amount of compensation to be awarded to Petitioner. The parties disputed whether Petitioner was entitled to recover for loss of earnings, requiring the undersigned's input. The undersigned issued a Ruling on Petitioner's loss of earnings claim in June 2024, finding Petitioner entitled to past lost wages from October 6 through October 17, 2014. Ruling Regarding Petitioner's Lost Earnings Claim ("Lost Earnings Ruling") dated June 26, 2024 (ECF No. 181). Based on that ruling, the parties agreed Petitioner's lost earnings was $3,131.00. Respondent's Brief on Damages ("Resp. Br."), filed Mar. 10, 2025, at 1 n.2 (ECF No. 211); Joint Status Report ("Rept."), filed Jan. 2, 2025 (ECF No. 204).

The parties have also been unable to resolve the amount of compensation to be awarded for pain and suffering and unreimbursable out-of-pocket expenses, and the parties requested that the Court resolve these matters following briefing. The parties briefs have now been filed. After consideration of all the evidence, and for the reasons described herein, the undersigned awards Petitioner (1) $125,000.00 for actual pain and suffering, (2) $3,131.00 for lost wages, and (3) $1,215.32 for past unreimbursed expenses, for a total award of $129,346.32.

## I.    PROCEDURAL HISTORY

The procedural history is set forth in two rulings, the Ruling on Entitlement, filed August 19, 2021, and the Ruling regarding Petitioner's lost earning claim, refiled as redacted on September 5, 2024. See Ruling on Entitlement at 2; Lost Earnings Ruling at 2.

Thereafter, the parties were unable to resolve outstanding damages for pain and suffering and out-of-pocket expenses and requested to submit the damages items that remained in dispute to the Court for resolution on the briefs. Joint Status Rept., filed Jan. 10, 2025 (ECF No. 206).

On February 17, 2025, Petitioner filed a brief in support of his claim for pain and suffering. Pet. Memorandum on Pain and Suffering ("Pet. Pain and Suffering Memo."), filed Feb. 17, 2025 (ECF No. 210). Respondent filed his responsive brief on March 10, 2025. Resp. Br. On August 7, 2025, Petitioner filed an itemized list of out-of-pocket expenses for which he was seeking reimbursement. Pet. Exhibit ("Ex.") 70. Respondent provided his position on Petitioner's out-of-pocket expenses on August 27, 2025, and Petitioner responded on September 10, 2025. Resp. Position on Out-of-Pocket Expenses ("Resp. Out-of-Pocket Br."), filed Aug. 27, 2025 (ECF No. 215); Pet. Final Request for Out of Pocket Expenses ("Pet. Out-of-Pocket Memo."), filed Sept. 10, 2025 (ECF No. 218).

This matter is now ripe for adjudication.

## II.    FACTUAL HISTORY

### A.    Medical Record History

The Ruling on Entitlement and Ruling Regarding Petitioner's Lost Earnings Claim set forth a summary of Petitioner's medical records, affidavit, and expert opinions. See Ruling on

Entitlement 3-18; Lost Earnings Ruling 3-23.  These summaries are incorporated herein as if fully set forth.  Further, the parties have set forth summaries of relevant facts which support their respective positions in their briefs, which the undersigned has reviewed.  A summary of some facts relevant to this Decision follows.  While all the records are important, these entries provide context for the reader.

Petitioner was 46 years of age when he received his third Hep B vaccination,[3] on October 2, 2014, in his left arm.  Pet. Ex. 1 at 6.  Four days later, on October 6, 2014, Petitioner presented to neurologist Dr. Shahbuddin Mukardamwala, with weakness of the left side of his face.  Pet. Ex. 3 at 1.  Petitioner reported that he had received the Hep B vaccine the prior Thursday (October 2, 2014), and that the following day, Friday (October 3, 2014), he had a severe headache involving the left postauricular[4] area.  Id.  By Saturday (October 4, 2014), Petitioner was unable to close his left eye and he had numbness of the left side of his face.  Id.  He sought treatment at a local emergency room, where he was noted to have neuropathic pain.  Pet. Ex. 7 at 2.  Dr. Mukardamwala's physical examination revealed that Petitioner was unable to wrinkle the left side of his forehead, that he had left eye closure weakness, and left nasolabial flattening.  Id.  Petitioner was diagnosed with "[l]eft peripheral seventh nerve palsy."  Id. at 2.

Petitioner had worsening of his left postauricular pain on October 13, 2014.  Pet. Ex. 3 at 3.  MRI of the brain performed on October 14, 2014 did not show any acute intracranial process.  Pet. Ex. 5 at 15.

Dr. Mukardamwala saw Petitioner on October 17, 2014 for continued symptoms.  Pet. Ex. 3 at 4.  The day before, Petitioner called to report "severe left-sided occipital temporal headaches with subjective feeling of numbness."  Id.  Dr. Mukardamwala increased the dose of Cymbalta, which Petitioner stated did not help him.  Id.  Physical examination showed Petitioner's eye closure had improved.  Id.  Petitioner underwent an occipital nerve block.  Id.  He tolerated the procedure well and after it was completed, reported improvement.  Id. at 5.  Tylenol #3 and Ativan were given for anxiety and pain.  Id.  Dr. Mukardamwala noted that Petitioner was improving.  Id.  Because Petitioner's symptoms were improving, Dr. Mukardamwala told Petitioner he could return to work.  Id.

On November 4, 2014, Petitioner returned for follow-up.  Pet. Ex. 3 at 6.  Since receiving the nerve block at the previous visit, "his pain [was] better."  Id.  He had been to the chiropractor and the treatment had "relieved his muscle tension."  Id.  He "report[ed] improvement in his symptoms."  Id.  Dr. Mukardamwala noted that Petitioner was "improving gradually."  Id.  "His facial strength was better," his "[l]eft nasolabial fold [was] reappearing," "[h]is forehead wrinkling ha[d] improved," and he had "improvement in blinking on left side."  Id.

---

[3] The Hep B vaccine is given in a series of three doses on a zero, one-month, and six-month schedule.  See Pet. Ex. 41 at 2.  Petitioner received the ENGERIX-B vaccine.  Pet. Ex. 1 at 6.

[4] The postauricular area is behind or posterior to the auricle, the exterior portion of the ear.  Dorland's Illustrated Medical Dictionary 1479 (33d ed. 2020).

On January 5, 2015, Petitioner saw Dr. Mukardamwala for follow-up, and he complained of panic attacks and night terrors. Pet. Ex. 3 at 7. His Bell's palsy had improved—he had a symmetric smile and symmetric forehead wrinkling. Id. He was prescribed Paxil 20 mg to be taken twice daily for anxiety and melatonin at night for sleep. Id. Petitioner returned on February 24, 2015, with complaints of "left facial tightness and facial spasms." Id. at 8. Warm compresses and Methocarbamol[5] were prescribed for facial tightness and spasms, and his dose of Paxil was decreased. Id. Petitioner was also referred to psychiatry. Id.

Dr. Salah Qureshi, a psychiatrist, saw petitioner on March 11, 2015. Pet. Ex. 6 at 4; Pet. Ex. 8 at 2. Petitioner reported facial pain, anxiety, and depression. Pet. Ex. 6 at 4; Pet. Ex. 8 at 2. Dr. Qureshi prescribed Effexor.[6] Pet. Ex. 6 at 5; Pet. Ex. 8 at 2. Dr. Qureshi continued to see and treat Petitioner over a period of several years. See generally Pet. Ex. 8. On October 20, 2015, Dr. Qureshi diagnosed Petitioner with post-traumatic stress disorder ("PTSD"). Id. at 6.

Petitioner returned on April 13, 2016 for follow-up and reported that he was "doing fine." Pet. Ex. 8 at 8. He was "undergoing [a] jury trial for divorce and fe[lt] pressured because of that. He [was] stressed out financially and [was] also taking care of his [two] year old daughter." Id. He felt "overwhelmed," "anxious at times," and had experienced a "panic attack 10 days ago . . . for a few minutes." Id. He was "angry and frustrated at his wife" who "initially ran away with his daughter." Id. Dr. Qureshi documented that Petitioner was "able to sleep well at night." Id. His medications, particularly the Wellbutrin, were "working well for him." Id. At the April 13, 2016 visit, Petitioner did not report that he had been terminated from his employment due to failure to obtain approval for leave. See id.; see also Pet. Ex. 63 at 190.

There are no records of visits to Dr. Qureshi's office after the visit on April 13, 2016 until April 26, 2017, a period of over one year. See Pet. Ex. 8 at 9.

On April 26, 2017, Petitioner returned to Dr. Qureshi for anxiety and medication refill. Pet. Ex. 8 at 9. He reported "feeling very anxious due to ongoing divorce." Id. He "[was] restless and not able to sleep well." Id. He was also "overwhelmed and stressed." Id. He was "taking care of his daughter" and "looking for a job now." Id. Diagnosis was PTSD. Id. He restarted Klonopin and started Zoloft.[7] Id.

---

[5] "Methocarbamol is indicated as an adjunct to rest, physical therapy, and other measures for the relief of discomfort associated with acute, painful musculoskeletal conditions." Methocarbamol, RxList, https://www.rxlist.com/consumer_methocarbamol_robaxin/drugs-condition.htm (last visited Oct. 9, 2025).

[6] Effexor (venlafaxine) "is used to treat depression, anxiety, panic attacks, and social anxiety disorder (social phobia)." Venlafaxine, RxList, https://www.rxlist.com/consumer_venlafaxine_effexor_effexor_xr/drugs-condition.htm (last visited Oct. 9, 2025).

[7] "Zoloft (sertraline) is an SSRI (selective serotonin reuptake inhibitors) antidepressant prescribed for the treatment of[] depression, obsessive compulsive disorder (OCD), panic disorder, [PTSD], [and] social anxiety disorder . . . ." Zoloft, RxList, https://www.rxlist.com/zoloft-drug.htm (last updated Sept. 6, 2023).

Petitioner returned for follow-up of his anxiety to Dr. Qureshi's office on May 10, 2017 and saw Jie Zheng, Physician Assistant ("PA"). Pet. Ex. 8 at 11. Petitioner was "less depressed and less anxious." Id. He reported "sleeping better." Id. His diagnosis remained PTSD. Id. His medications were renewed. Id. at 11-12.

At the next follow-up visit on June 7, 2017, Petitioner saw Quynh Tu Vu, PA. Pet. Ex. 8 at 13. Petitioner was "feeling fair," although he "continue[d] to have some anxiety and depression." Id. He was "more concerned with the anxiety due to ongoing divorce proceeding and child custody trial." Id. Prescriptions for refills of Klonopin and new prescriptions for Paxil and Tramadol[8] were given. Id. at 14.

On August 25, 2017, petitioner underwent a medical examination for a social security disability determination by Dr. Ron Kirkwood. Pet. Ex. 14 at 2-5. Dr. Kirkwood noted that Petitioner continued to have palsy on the left side of his face and that it affected his eye. Id. at 2.

Petitioner returned to Dr. Qureshi next on April 2, 2018, ten months after his last appointment in June 2017. Pet. Ex. 8 at 13; Pet. Ex. 46 at 2. On April 2, 2018, Petitioner reported to Dr. Qureshi that in March he was admitted to the hospital for chest pain but was diagnosed with anxiety. Pet. Ex. 46 at 2. His primary care physician prescribed Diazepam for anxiety, and he was "doing much better." Id. Also, Petitioner "recently received custody of his daughter and he [was] feeling better." Id. Dr. Qureshi's diagnosis was PTSD and insomnia, and refills were given for Diazepam, Paxil, and Ambien. Id. at 2-3.

Petitioner presented to Dr. Raghu Athre, M.D., on April 25, 2018, complaining of tightness in the left side of his face. Pet. Ex. 11 at 1. Petitioner reported that his "muscle tightness [was] due to Bell's palsy" in October 2014, and that he had "pain due to the muscle spasm." Id. at 3. Dr. Athre documented that Petitioner had "complete facial nerve movement on the left side." Id. Physical examination revealed his "[t]rigeminal nerve [was] intact over all three branches. No cranial nerve deficits [were] noted." Id. at 1. Dr. Ahtre "explained to [Petitioner] that [he] fe[lt] his cosmetic outcome after Bell's palsy [was] excellent." Id. Dr. Ahtre did not recommend any additional treatment for Petitioner's Bell's palsy. Id.

Jie Zheng, PA saw Petitioner for follow-up on May 3, 2018. Pet. Ex. 46 at 4. Petitioner now had "custody of his daughter and [was] happy about it." Id. He reported being less depressed and anxious. Id. He also left paperwork to support his disability claim with Dr. Qureshi to complete. Id. Petitioner "denie[d] other life stressors at present." Id. At his follow-up visit on June 4, 2018 with Jie Zheng, PA, Petitioner reported "doing 'ok'" and less depressed and anxious on his current medications. Id. at 6. He had an MRI due to back pain and was taking Tylenol #3 for the pain. Id. Petitioner reported some anxiety and stress related to caring for his daughter. Id. He was also noted to be in the process of getting a divorce. Id. Petitioner's next visit was July 2, 2018, again with Jie Zheng, PA. Id. at 8. The records from that visit do

---

[8] "Ultram (tramadol) is a pain reliever (analgesic) used to treat moderate to moderately severe pain in adults." Ultram, RxList, https://www.rxlist.com/ultram-drug.htm (last updated July 11, 2022).

not show any substantive changes in Petitioner's condition.  See id. at 8-9.  At these three visits, Petitioner's Bell's palsy was not documented as contributing to his anxiety.  See id. at 4-9.

Petitioner had a telephone visit with Dr. Qureshi on July 17, 2018, and was seen by Sheila Huynh, PA, to complete his disability paperwork.  Pet. Ex. 46 at 11.  He reported that he was "not able to focus" and had been "out of work since March 2016."  Id.  "He complain[ed] of continue[d] pain and not [being] able to stand for [a] long time."  Id.  His current stressor was "out of work[] and divorce complete."  Id.  Petitioner did not identify his Bell's palsy as a current stressor.  See id.  Diagnosis was PTSD and insomnia.  Id. at 12.  Petitioner's medications were refilled.  Id.

On August 7, 2018, Petitioner saw Jie Zheng, PA.  Pet. Ex. 46 at 14.  They discussed his medication regimen.  Id.  He reported being stressed by his divorce case; his next court date was August 22.  Id.  At his next visit on September 7, 2018, Petitioner again saw Jie Zheng, PA.  Id. at 17-18.  There was no history documented.  Id.  Petitioner had a two-month follow-up visit on November 12, 2018 with Jie Zheng, PA.  Id. at 20.  He reported that "he ha[d] been off his medications for several weeks," and he could not make an appointment due to a procedure.  Id.  He was "struggl[ing] with his ex-wife" and reported "she [was] causing troubles."  Id.

In 2018 and 2019, Petitioner received medical care at Memorial Hermann Clinic, where he saw family practice physician, Dr. Marlyn Generillo, for general medical care.  See Pet. Ex. 49.  On May 9, 2018, Petitioner saw Dr. Generillo for low back pain that "started in 2004."  Id. at 3.  The note from that visit stated that Petitioner was unable to work due to his back pain.  Id.  Formerly, Petitioner "work[ed] as a pharmacist but standing for long periods of time hurt his back a lot."  Id.  Dr. Generillo also noted Petitioner's history of severe anxiety.  Id.  Petitioner's Problem List did not include Bell's palsy.  See id.  Review of symptoms did not identify any problems secondary to Bell's palsy.  See id.  Physical examination did not identify any abnormalities related to Bell's palsy.  See id. at 3-4.  Dr. Generillo refilled Petitioner's prescription for Tylenol #3 and ordered Flexeril and meloxicam for back pain.  Id. at 4.

In addition to back pain, Petitioner also sought treatment at Memorial Hermann Clinic in 2018 and 2019 for his "history of weak sphincter muscles."  Pet. Ex. 49 at 12.  On October 16, 2018, Dr. Khani noted that Petitioner had a past medical history of "stress disorder due to chronic back pain with herniated disc."  Id.  The appointment focused on Petitioner's rectal pressure and urgency and frequent bowel movements.  See id. at 12-13.  There was no discussion of Bell's palsy.  See id.  Petitioner completed a patient questionnaire at this appointment.  Id. at 21-23.  In the section about past medical history, Petitioner did not document his history of Bell's palsy.  See id. at 21.  He also did not document any current symptoms related to Bell's palsy in his review of systems.  See id. at 23.  Petitioner documented his current symptom of anxiety and wrote it was "due to stress from the anal sphincter issue.  Excessive [bowel movement] urgency and chronic back problem due to herniated lumbar disc."  Id.  He did not attribute his current anxiety to Bell's palsy.  See id. at 21-23.

Petitioner's records from 2018 to 2022 do not document that he was experiencing stress or anxiety due to his Bell's palsy or any medical or physical sequela from his Bell's palsy.  Instead, during this time frame, his stressors were documented to be related to obtaining custody

of his daughter, his ongoing divorce proceedings, and his finances.  See Pet. Ex. 46 at 2-22.  In 2019, Petitioner's reported stressors were related to his finances, ex-wife, worry for his daughter, back pain, and the denial of his disability application.  See id. at 23-46.  In 2020 and 2021, Petitioner experienced anger and stress for all of these same reasons, compounded by the stress of the Covid pandemic.  Id. at 47-69.  Medical records from Petitioner's appointments in 2022 were all very similar.  See Pet. Ex. 55 at 5-14.  On May 9, Petitioner reported that his current stressors included "dealing with mental illness and finances."  Id. at 5.  At the visit on August 1, Petitioner reported "depression and anxiety related to his past trauma.  He report[ed] he ha[d] started therapy to work through these issues."  Id. at 8.  The past trauma was not described in the records.  See id.  Bell's palsy, or its residual effects, was not mentioned.  See id.  Although the note stated that he had started therapy, the name of the therapist was not identified.  See id.  And on November 1, 2022, Petitioner reported that his current stressors were "dealing with mental illness" and "related to finances and trouble gaining SSI [disability]."  Id. at 11.

In 2021, Petitioner sought treatment for his low back pain that began in 2004 and worsened over time.  Pet. Ex. 48 at 12.  On May 25, 2021, he saw Dr. Seema Rasheed at Texas Pain where he reported having back pain every day which prevented him from being able to work.  Id.  Petitioner also complained of gastrointestinal issues and a rectocele, which "cause[d] him a lot of anxiety."  Id.  Petitioner was diagnosed with lumbar radiculopathy, lumbar spondylosis, anxiety, lumbar degenerative disc disease, chronic pain disorder, and "[a]dmission for long-term opiate use."  Id. at 12-13.  Petitioner reported that he had been taking Tylenol #3 "for some time" and it "seem[ed] to help the best."  Id. at 13.  Petitioner reported that he was seeing a psychiatrist for his anxiety.  Id.  Bell's palsy was listed in Petitioner's past medical history, however there was no indication that Petitioner was experiencing any pain secondary to his history of Bell's palsy.  Id. at 12-14.

Petitioner returned to Texas Pain for follow-up and medication refills from July through November 2021.  Pet. Ex. 46 at 15-26.  At the visit on August 18, 2021, Petitioner reported seeing a psychologist[9] and psychiatrist weekly.  Id. at 19.  On September 13, Petitioner stated that he "continue[d] to have anxiety from the injection . . . which gave him Bell's palsy, and [he was] not interested in injections" as treatment for his back pain.  Id. at 21.  In October 2021, Petitioner stated that his back pain was "well controlled" with his current medication.  Id. at 23.

Petitioner also filed medical records from Texas Pain documenting monthly visits from December 8, 2021 until November 30, 2022 for continued treatment of his chronic back pain. Pet. Ex. 48 at 35-36; Pet. Ex. 56 at 1-23.  Assessments for these visits included lumbar radiculopathy, anxiety, chronic abdominal pain, lumbar spondylosis, lumbar degenerative disc disease, chronic pain disorder, and "[a]dmission for long-term opiate use."  Pet. Ex. 56 at 1, 3, 5, 7, 9, 12-14, 16, 18, 20, 22.  "Myofascial pain" was added under assessments on October 26, 2022 and was included in the assessments from the visit on November 30, 2022.  Id. at 20, 22.  During the period of treatment, Petitioner was prescribed acetaminophen with Codeine, Cyclobenzaprine, and Flexeril for treatment of his back pain.  Id. at 1-23.  The records indicated that Petitioner underwent surgery for an abdominal hernia in February 2022.  Id. at 4.  There is

---

[9] Petitioner did not identify the psychologist who was treating him in 2021, and it does not appear he has produced records from that provider.

no mention in these records to any pain or other residual effects from Bell's palsy.  See id. at 1-23.

Petitioner was seen by Dr. Tariq for a "legal evaluation" on January 13, 2023.  Pet. Ex. 59 at 2.  The evaluation was done "in the context of [Petitioner's] lawyers wanting to talk to supervising provider about patient's current mental status."  Id.  Petitioner reported "low mood, anhedonia, lack of energy, feelings of hopelessness, insomnia[,] and feelings of helplessness." Id.  He also "discussed the impact his facial palsy [] had on his mental health."  Id.  He reported that he never had "depression or anxiety prior to the facial palsy.  He fe[lt] the facial palsy, through the symptoms it caused [] including head and neck pain, change in appearance etc. ha[d] impaired him to the point that he has no meaningful ability to function socially or occupationally."  Id.  Petitioner acknowledged "mild improvement in his depressive and anxiety symptoms with medication [] and psychotherapy."  Id.  On examination, Dr. Tariq noted Petitioner's thought process was "[l]ogical and linear," his short- and long-term memory were normal, his attention span was normal, and insight and judgment were fair.  Id. at 3.  Dr. Tariq's diagnoses included "[m]ajor depressive disorder, recurrent episode, moderate;" "[g]eneralized anxiety disorder;" and PTSD.  Id.  Petitioner agreed to continue his current medications, which included Ambien for sleep as needed, Zoloft daily, Klonopin as needed three times per day, and Trazodone at bedtime as needed.  Id.

In addition to the medical records, Dr. Tariq wrote two versions of a "Psychiatric Opinion Letter," both dated February 2, 2023, regarding his visit with Petitioner on January 13, 2023.[10] Pet. Exs. 57-58.  In the first, Dr. Tariq stated that Petitioner had been under his care since May 2021, through Jayma Mickler, PAC, and that he was seen for a comprehensive evaluation on January 13, 2023.  Pet. Ex. 57 at 1; see Pet. Ex. 46 at 65; Pet. Ex. 59 at 2.  Dr. Tariq stated that despite treatment with medication and psychotherapy, Petitioner had "not experienced any meaningful or lasting improvement in his symptoms."  Pet. Ex. 57 at 1.  Dr. Tariq also stated that Petitioner "consistently cited his facial palsy as his primary stressor."  Id.  When seen on January 13, 2023, Petitioner was described as "severely depressed and anxious."[11]  Id. at 1-2.  Dr. Tariq concluded that it was his opinion that "the facial palsy subsequent to [Hep] B vaccination in October of 2014 is the most important predisposing and precipitating factor in the etiology of [Petitioner's] current psychiatric symptoms."  Id. at 2.  Dr. Tariq added that "[t]he changes in [Petitioner's] appearance and functioning of his facial muscles, as well as head and neck pain resulting from the Bell's [p]alsy continue to be perpetuating factors for his mood, anxiety[,] and PTSD symptoms."  Id.

_____

[10] The second opinion letter is similar to the first but includes a paragraph about Petitioner's inability to work.  See Pet. Ex. 58 at 2.

[11] This statement is in contrast with Dr. Tariq's record on January 13, in which he diagnosed Petitioner with "moderate" but not severe depression.  Pet. Ex. 59 at 3.

### B.    Petitioner's Affidavits and Declarations[12]

Petitioner executed an affidavit on February 28, 2019.  Pet. Ex 15.  In it, Petitioner averred that he received the Hep B vaccine at issue on Thursday, October 2, 2014.  Id. at ¶ 1.  On the afternoon of Friday, October 3, 2014, he began having a headache.  Id. at ¶ 2.  His headache continued and became severe, with "sharp piercing pain behind [his] left ear, and [his] left eye was mildly burning with flowing tears."  Id.  On Sunday, October 5, 2014, Petitioner's pain, eye burning, and tearing continued.  Id. at ¶ 3.  When he arrived home after work, and looked in the mirror, he saw that his "face was deformed."  Id.  His left eye did not blink or close, his mouth could not hold water when he tried to brush his teeth, the left side of his face had no feeling, he was unable to chew food, and his mouth was drooping on the left side.  Id.  Petitioner "thought [he] was having a stroke," and so he drove himself to an emergency room.  Id.

At the emergency room, Petitioner was given medication for his severe headache.  Pet. Ex. 15 at ¶ 4.  The "sharp piercing pain behind [his] left ear continued for [three to four] months" and did not respond to medical treatment, so Petitioner had a nerve block.  Id. at ¶ 5.  Petitioner also had numbness of his tongue for approximately six months.  Id.

As of the date of the affidavit, February 28, 2019, Petitioner averred that he continued to "experience tightness and spasms in the left corner of [his] mouth, the left side of [his] face, and the top of [his] left eye below [the] eyebrow."  Pet. Ex. 15 at ¶ 6.  Petitioner also stated that he had fatigue and spasms of his left eye.  Id.  He avoided smiling because his smile is not symmetric.  Id.

Due to his Bell's palsy, Petitioner averred that he "developed chronic anxiety, depressive episodes, nightmares due to panic attacks at night, and chronic insomnia."  Pet. Ex. 15 at ¶ 7.  He further alleged that he has been "diagnosed with PTSD and chronic insomnia."  Id.  He saw a psychiatrist and took medication to treat these conditions.  Id.

As of December 2023, Petitioner explained his face does not look "normal" and appears "uneven" when he tries to smile.  Pet. Ex. 68 at ¶ 6.  If he is stressed, he feels "a band around [his] face that hurts" and his "left eye will twitch and water."  Id.  He also reported "[his] left ear is much more sensitive to sounds" since his Bell's palsy.  Id.  When the phone would ring at work, his left ear would hurt and increase his anxiety, and as his anxiety increased, his symptoms and pain would also increase.  Id.  And due to this anxiety, he found it "very hard to concentrate and remember."  Id.

---

[12] Petitioner executed his first affidavit on December 12, 2017, but it is not summarized herein.  See Pet. Ex. 9 at 1.  In addition, he executed a declaration on September 25, 2023, regarding short term disability, and a declaration on December 4, 2023, regarding his claim for lost wages.  See Pet. Exs. 67-68.  Petitioner's second affidavit is the most relevant to the issue of pain and suffering, and so it is summarized herein.  See Pet. Ex. 15.  A portion of his December 4, 2023 declaration is also included in this summary.  See Pet. Ex. 68.

III.    **PAIN AND SUFFERING**

A.    **Parties' Contentions—Pain and Suffering**

1.    **Petitioner's Contentions**

Petitioner requests a past and future pain and suffering award of $250,000.00. Pet. Pain and Suffering Memo. at 6, 9. If $250,000.00 is not awarded for past pain and suffering, Petitioner recommends an award for future pain and suffering until the statutory cap ($250,000.00) is hit. Id. at 6. He provides an example of an award of $150,000.00 for past pain and suffering, and $10,000.00 per year, for the next ten years, to reach $250,000.00. Id. at 6-7.

Petitioner notes awareness of the injury is not in dispute. Pet. Pain and Suffering Memo. at 9. Regarding the duration of Petitioner's injury, Petitioner contends his injury is chronic. Id. Petitioner developed Bell's palsy in October 2014 and has suffered from the condition since that time. Id. Regarding severity, Petitioner explains that he has experienced pain, hearing problems, and psychological injury which affects his interactions with people, his ability to tolerate loud noises, and his enjoyment of life. Id.

To support his contention that he has suffered long-term psychological effects from his Bell's palsy, Petitioner cites two medical articles referenced by his expert, Dr. Kinsbourne. Pet. Pain and Suffering Memo. at 7. The Fu et al.[13] article reported "significant levels of psychological distress" in some patients with "widespread low levels of psychological distress in the sample as a whole" and "[s]ignificant correlations . . . between some of the participants' perceptions of their facial palsy and their level of psychological distress." Pet. Ex. 18 at 4-5. And Baugh et al.[14] reported that "Bell's palsy patients with incomplete facial nerve recovery are at risk for function and psychological impairment." Pet. Ex. 43 at 21.

In conclusion, Petitioner requests $250,000.00 for his past and future pain and suffering and emotional distress. Pet. Pain and Suffering Memo. at 9. If an amount less than $250,000.00 is awarded for past damages, Petitioner asks the undersigned to apply the Youngblood rule,[15] and award a future pain and suffering award. Id.

---

[13] L. Fu et al., Psychological Distress in People with Disfigurement from Facial Palsy, 25 Eye 1322 (2011).

[14] Reginald F. Baugh et al., Clinical Practice Guideline: Bell's Palsy, 149 Otolaryngol. Head & Neck Surg. S1 (2013).

[15] Petitioner asserts that the Federal Circuit's holding in Youngblood "mandates that the statutory cap of $250,000 [[§] 15(a)(4)] must be applied first. If the full $250,000 has not been awarded for past pain and suffering, then any portion of [P]etitioner's pain and suffering that is found by the Special Master to be 'future' must be reduced to net present value in accordance with [§] 15(f)(4)(A)[]." Pet. Pain and Suffering Memo. at 6 (citing Youngblood ex rel. Youngblood v. Sec'y of Health & Hum. Servs., 32 F.3d 552, 555 (Fed. Cir. 1994)).

### 2.     Respondent's Contentions

Respondent requests that the Court award Petitioner $125,000.00 for pain and suffering. Resp. Br. at 1.

First, Respondent contends "Petitioner experienced a moderate course of Bell's palsy of limited duration," consisting of an ER visit, follow-up care, chiropractic care, an MRI, prescription medications, and a nerve block. Resp. Br. at 17. He was cleared to return to work within two weeks, October 17, 2014. Id. at 17 n.14. He did not require surgery or specialized care to treat dry eyes. Id. at 18. When evaluated in 2018, Petitioner was noted to have an excellent outcome. Id. (citing Pet. Ex. 11 at 1). Thus, Respondent asserts that Petitioner has not shown any long-lasting effects of his condition or any evidence of residual impairments. Id.

Second, as for Petitioner's psychological injury, Respondent argues that Petitioner has "not provided preponderant evidence that he has suffered and continues to suffer mental anguish or 'psychological effects' from Bell's palsy." Resp. Br. at 18. Respondent notes that after the vaccination at issue, Petitioner had "numerous personal stressors in his life," including divorce, loss of his job, financial problems, childcare for his young child, and other medical problems (back pain, rectal fistula, weak sphincter muscles, and thyroid nodule). Id. at 18-19.

In further support, Respondent discussed Sturdevant, where the undersigned awarded $100,000.00 in pain and suffering to a petitioner with a vaccine-related injury of Bell's palsy. Resp. Br. at 19 (citing Sturdevant v. Sec'y of Health & Hum. Servs., No. 17-172V, 2024 WL 1045145, at *1 (Fed. Cl. Spec. Mstr. Feb. 12, 2024)). In Sturdevant, the petitioner did not require an occipital nerve block, but he continued to have right-sided facial weakness eight years following diagnosis, required eye protection, and had problems with coordination and drinking liquids. Id. (citing Sturdevant, 2024 WL 1045145, at *12). Here, Respondent asserts that Petitioner did not have any of these sequela. Id. Respondent concluded that "[g]iven that [P]etitioner herein made a positive recovery from his Bell's [p]alsy without permanent or ongoing sequela, but required additional medical intervention greater than the petitioner in Sturdevant, an award of $125,000.00 in pain and suffering is reasonable and wholly appropriate." Id.

### B.     Legal Framework—Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996)

("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." Graves, 109 Fed. Cl. at 589-90. Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. Id. at 595.

### C.    Analysis—Pain and Suffering Award

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $125,000.00 in actual pain and suffering to be fair, reasonable, and appropriate.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress. In the undersigned's experience, awareness of suffering is not typically a disputed issue in cases involving Bell's palsy. In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering. Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he has full awareness of his suffering.

The factors that particularly influence this award include the severity and duration of Petitioner's injury and the physiological injury he experienced.  The undersigned finds that Petitioner experienced a moderately severe Bell's palsy for which he received limited medical treatment, including treatment at a local emergency room, an MRI, visits to a neurologist from October 2014 though January 2015, an occipital nerve block, prescription medications, and chiropractic care.

Unlike some petitioners who suffer Bell's palsy, Petitioner did not experience an ongoing inability to close his eye, dry eyes, or require ophthalmological care for eye issues.  Initially Petitioner had eyelid closure weakness, but by November 4, 2014, his facial strength was noted to be improved.  By April 25, 2018, physical examination revealed complete recovery of his facial nerve movements.  Further, Petitioner did not experience ongoing problems drinking, swallowing, or eating.  He was assessed with an excellent physical recovery.

Petitioner asserts that his Bell's palsy affected his hearing (left ear more sensitive to sound) and that his smile is uneven.  However, these deficits are not supported by the medical records.  There is no reference in Petitioner's medical records to hearing loss or sensitivity caused by his Bell's palsy.  Further, Petitioner's smile was noted to be symmetric on January 5, 2015, when he saw Dr. Mukardamwala for follow-up.  See Pet. Ex. 3 at 7 (documenting improvement of his Bell's palsy with a symmetric smile and symmetric forehead wrinkling).

Although he recovered well from a physical point of view and his cosmetic outcome was noted to be excellent, Petitioner suffered emotional distress described as panic attacks and night terrors that he attributed to his Bell's palsy.  Due to this distress, Petitioner was referred to a psychiatrist, Dr. Qureshi, who diagnosed Petitioner with PTSD.  Petitioner required psychiatric treatment March 2015 through April 2016, for a period of approximately one year.  During that time, Petitioner saw Dr. Qureshi and was prescribed medication for anxiety and depression.  At his visit to Dr. Qureshi on April 13, 2016, Petitioner reported that he was "doing fine."  Pet. Ex. 8 at 8.  At this visit, his primary stressors were related to ongoing divorce and child custody proceedings, including a jury trial, and the fact that he was providing care to his two year old daughter.  After April 13, 2016, there are no records to show that Petitioner sought or received psychiatric care related to his Bell's palsy.  He did not return to see Dr. Qureshi until one year later, on April 26, 2017, and at that time, Petitioner attributed his anxiety to his ongoing divorce.

Petitioner's medical records from 2018 to 2022 show numerous visits for other problems (stress disorder due to chronic back pain due to herniated disc, anal sphincter problem with urgency, chest pain, and anxiety related to divorce) but no documented medical or psychiatric care for his Bell's palsy.  During this time frame, Petitioner's reported stressors were related to other concerns, not to his Bell's palsy.  Moreover, from 2021 through 2022, Petitioner had monthly visits for treatment of his chronic back pain.  In February 2022, he had surgery for an abdominal hernia.  There is no mention in the records during these years of pain, anxiety, or emotional distress due to his Bell's palsy.

Regarding Dr. Tariq's 2023 "legal evaluation" and "Psychiatric Opinion Letter," the undersigned does not find the opinions to be persuasive for several reasons.[16]  First, the opinions of Dr. Tariq in January and February 2023 relate to Petitioner's "current mental status" which was over eight years after his episode of Bell's palsy.  Pet. Ex. 59 at 2.  During that eight-year period, Petitioner went back to work for over one year, was terminated by CVS, was involved in custody and divorce proceedings, obtained custody of his young daughter, began taking care of his young daughter as a single parent, had progressive back pain requiring pain management treatment, had significant rectal sphincter problems, and experienced other health problems.  The passage of time, as well as these life events, likely impacted Petitioner's mental and physical well-being.  Therefore, Dr. Tariq's opinions based on Petitioner's current condition in 2023 do not speak to the question of Petitioner's pain and suffering or emotional distress after his episode of Bell's palsy and its sequalae with an onset in October 2014.

Further, although Dr. Tariq may have been Petitioner's physician beginning in 2021 and throughout 2022, he did not have any personal knowledge or information about Petitioner prior to that time.  Moreover, it is not clear that Dr. Tariq personally evaluated or examined Petitioner in 2021 and 2022, since during that time frame he was seen by Jayma Mickler, PAC.  The only time that the records show that Dr. Tariq personally evaluated Petitioner was the remote telemedicine interview in January 2023, when Dr. Tariq performed the evaluation for his legal opinion letter.  See Pet. Ex. 57 at 1-2; Pet. Ex. 58 at 1-2; Pet. Ex. 59 at 2-4.

Another problem with Dr. Tariq's opinion letters is that they are inconsistent with his own medical records and the records of Petitioner's other treating physicians.  Dr. Tariq's medical record history states that Petitioner reported that his "facial palsy, through the symptoms it caused [] including head and neck pain, change in appearance etc. has impaired him to the point that he has no meaningful ability to function socially or occupationally."  Pet. Ex. 59 at 2.  However, this history is based on Petitioner's report, and references to head and neck pain are not including in the records from Petitioner's other treating physicians.  This history is also contradicted by the records of Dr. Athre from April 2018, noting that Petitioner had "complete facial nerve movement" and an "excellent" outcome.  Pet. Ex. 11 at 3.  Dr. Tariq's 2023 letter is also inconsistent with the records from 2018 until 2023, in that there are no references to ongoing pain, changes in appearance, or inability to function socially due to Bell's palsy.

Moreover, Dr. Tariq's opinion letters do not acknowledge the facts and circumstances of Petitioner's life over the prior eight years.  He did acknowledge that Petitioner had been terminated from employment for failing to obtain approval for leave.  He did not document or take into consideration that Petitioner had returned to work after his Bell's palsy episode.  He did not address the difficult circumstances of going through custody and divorce proceedings or being the single parent of a young daughter.  He did not reference Petitioner's chronic back pain, necessitating pain management.  He did not address Petitioner's other health problems, such as his issues with bowel urgency due to rectal sphincter problems.  And he did not consider how difficult the Covid pandemic was for Petitioner.

---

[16] For a more detailed discussion of the undersigned's findings relative to Dr. Tariq's evaluation and opinions, see Lost Earnings Ruling at 34-36.

Generally, treating physician statements are typically "favored" as treating physicians "are likely to be in the best position to determine whether a 'logical sequence of cause and effect show[s] that the vaccination was the reason for the injury.'"  Capizzano v. Sec'y of Health & Hum. Servs., 440 F.3d 1317, 1326 (Fed. Cir. 2006) (quoting Althen v. Sec'y of Health & Hum. Servs., 418 F.3d 1274, 1280 (Fed. Cir. 2005)).  However, no treating physician's views bind the special master, per se; rather, their views are carefully considered and evaluated.  § 13(b)(1); Snyder, 88 Fed. Cl. at 746 n.67.  "As with expert testimony offered to establish a theory of causation, the opinions or diagnoses of treating physicians are only as trustworthy as the reasonableness of their suppositions or bases."  Welch v. Sec'y of Health & Hum. Servs., No. 18-494V, 2019 WL 3494360, at *8 (Fed. Cl. Spec. Mstr. July 2, 2019).  An opinion by a treating physician that is not supported by a factual basis or other evidence is conclusory in nature.  See Robertson v. Sec'y of Health & Hum. Servs., No. 18-554V, 2022 WL 17484980, at *17 (Fed. Cl. Spec. Mstr. Dec. 7, 2022); Cedillo v. Sec'y of Health & Hum. Servs., 617 F.3d 1328, 1347 (Fed. Cir. 2010).

Additionally, Dr. Tariq's opinions are less persuasive as they were not made contemporaneously and were prepared for the purposes of litigation.  See Zumwalt v. Sec'y of Health & Hum. Servs., No. 16-994V, 2019 WL 1953739, at *19 (Fed. Cl. Spec. Mstr. Mar. 21, 2019) (rejecting opinion from a treating provider when he presented an opinion two-and-one-half years after treatment and after litigation was initiated), mot. for rev. den'd, 146 Fed. Cl. 525 (2019); Vergara v. Sec'y of Health & Hum. Servs., No. 08-882V, 2014 WL 2795491, at *4 (Fed. Cl. Spec. Mstr. May 15, 2014) ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."); Campbell ex rel. Campbell v. Sec'y of Health & Hum. Servs., 69 Fed. Cl. 775, 779 (2006) ("It is, of course, true that where later testimony conflicts with earlier contemporaneous documents, courts generally give the contemporaneous documentation more weight."); Ricci v. Sec'y of Health & Hum. Servs., 101 Fed. Cl. 385, 391 (2011) ("Medical records from years later, merely chronicling a timeline between vaccination and injury, are not worthy of the same consideration as contemporaneous records.").

Regarding Petitioner's affidavits and declarations, the undersigned generally finds these express Petitioner's view of his circumstances.  Some of Petitioner's statements are inconsistent with contemporaneous records, which diminishes their persuasive value.  For example, in his initial affidavit executed in 2017, Petitioner averred that in the three years prior to vaccination on October 2, 2014, he was in "good health and [] had not needed to see a health care provider."  Pet. Ex. 9 at ¶ 4.  However, his employment records show that Petitioner took a two-month leave

15

of absence for health reasons from May to July 2013, and another two months leave of absence for health reasons from May to July 2014.[17]

Because Petitioner's affidavits and declarations are inconsistent with and contradicted by the contemporaneous medical records, it is reasonable to give greater weight to the contemporaneous medical records. See Cucuras v. Sec'y of Health & Hum. Servs., 993 F.2d 1525, 1528 (Fed. Cir. 1993) (noting that "the Supreme Court counsels that oral testimony in conflict with contemporaneous documentary evidence deserves little weight"); Doe/70 v. Sec'y of Health & Hum. Servs., 95 Fed. Cl. 598, 608 (2010); Stevens v. Sec'y of Health & Hum. Servs., No. 90-221V, 1990 WL 608693, at *3 (Cl. Ct. Spec. Mstr. Dec. 21, 1990) (noting that "clear, cogent, and consistent testimony can overcome such missing or contradictory medical records"); Vergara, 2014 WL 2795491, at *4 ("Special Masters frequently accord more weight to contemporaneously-recorded medical symptoms than those recorded in later medical histories, affidavits, or trial testimony."). This finding also extends to the lay witness affidavits and testimony. Other special masters have been faced with similar situations and found the contemporaneous medical records more persuasive than the affidavits and testimonies of lay witnesses. See, e.g., Rote v. Sec'y of Health & Hum. Servs., No. 90-036V, 1992 WL 165970, *5 (Cl. Ct. Spec. Mstr. July 1, 1992) (finding the lay witness testimony insufficient to overcome the weight of the contemporaneous medical records); Bergman v. Sec'y of Health & Hum. Servs., No. 90-1252V, 1992 WL 78671, *4 (Cl. Ct. Spec. Mstr. Mar. 31, 1992) (same); Daiza v. Sec'y of Health & Hum. Servs., No. 90-1188V, 1992 WL 59709, *4 (Cl. Ct. Spec. Mstr. Mar. 5, 1992) (same).

There is only one reasoned decision discussing damages in a Bell's palsy in a Vaccine Program case, Sturdevant, 2024 WL 1045145. There, the undersigned awarded $100,000.00 for actual pain and suffering. Id. at *1. In that case, the petitioner was unable to raise his eyebrow and had weakness and difficulty closing his eyelid. Id. at *12. He also had tearing and blurriness in his affected eye. Id. Physical therapy evaluation showed he was unable to close his eye completely and unable to drink from a cup. Id. After six months of physical therapy, Petitioner's level of function improved to 90% of his baseline, however, he was given a facial disability rating of 45 out of 100. Id. He required eye protection at work and had difficulty with

---

[17] The undersigned previously found that Petitioner's affidavit stating that he was in good health for the three years prior to his vaccination was inconsistent with his employment records which showed significant leave from employment for health reasons in both 2013 and 2014, prior to vaccination. Lost Earnings Ruling at 36. The undersigned also previously found Petitioner's employment records evidencing Petitioner's leave for medical reasons in 2013 and 2014 calls into question Petitioner's baseline health and mental health condition prior to vaccination. Id. While there is no suggestion that Petitioner had Bell's palsy prior to vaccination in any of his medical records, these extended leaves call into question the medical/mental health conditions which necessitated leave. Id. They also call into question whether Petitioner filed his complete pre-vaccination medical/mental health care records. Id. at 36-37. In the context of pain and suffering, there are entries in the medical records dating his chronic back pain back to 2004, as well as a reference to stress due to chronic back pain. These references again call into question whether Petitioner filed his complete pre-vaccination records related to his care for anxiety and emotional distress issues.

hand-eye coordination and drinking liquids. Id. Two years after onset, in 2017, his Bell's palsy was described as "still quite marked." Id. A physical examination in 2023, four years later, showed no improvement; the petitioner was still unable to fully close his affected eye and he had decreased contraction of the relevant eyelid muscles. Id. He worried about losing his ability to pass the requisite visual tests to maintain his employment. Id. The award of $100,000.00 acknowledged the petitioner's long duration of facial disability, worry about job security, and duration of suffering. Id. at *13.

Here, Petitioner has not been assessed with a facial disability, he is able to close his eye, and there is no evidence that his eye muscles have been adversely affected. While he was out of work a short period of time, he did not lose his employment due to Bell's palsy.[18] Further, he has had a good physical outcome. Thus, his physical injury is less severe than that experienced by the petitioner in Sturdevant. Regarding emotional distress, based on the contemporaneous medical records, Dr. Kinsbourne's expert opinion, and the medical literature which discusses the psychological effects of Bell's palsy, including depression and anxiety, the undersigned finds Petitioner experienced emotional distress due to his Bell's palsy.[19] This finding is taken into consideration in awarding compensation for Petitioner's pain and suffering.

The undersigned has considered the numbers proposed by both parties and agrees that the amount proposed by Respondent is appropriate. Considering the record as a whole, the undersigned finds that $125,000.00 represents a fair, reasonable, and appropriate amount of compensation here for Petitioner's pain and suffering and emotional distress. Petitioner suffered from Bell's palsy from October 2014 to 2018, when he was noted to have had an excellent result. Further, his emotional distress due to Bell's palsy was limited in time to April 2016, after which his emotional distress was attributed to other causes. The award of $125,000.00 acknowledges the severity of Petitioner's Bell's palsy and his duration of suffering, as well as the emotional distress he experienced.

Petitioner seeks compensation for future pain and suffering, however, this record does not support such an award. As stated above, the records evidence that Petitioner's emotional distress was not attributed to his Bell's palsy after April 2016, and he was assessed with an excellent outcome in April 2018. There is no evidence of ongoing pain or emotional distress to warrant an award for future pain and suffering damages.

## IV.    UNREIMBURSABLE EXPENSES

Petitioner may also recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which [P]etitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . related

---

[18] See Lost Earnings Ruling at 29-39 (finding Petitioner was not entitled to lost wages after October 17, 2014).

[19] See Lost Earnings Ruling at 29-39 (finding Petitioner was not entitled to lost wages after October 17, 2014).

travel expenses, and facilities determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer, 1996 WL 147722, at *22-23.

In his final request for out-of-pocket expenses, filed September 10, 2025, Petitioner requests reimbursement in the amount of $2,139.95 for costs related to his vaccine injury.[20] Pet. Out-of-Pocket Memo. at 2; see also Pet. Ex. 70. The amount requested represents the categories and amounts set forth in the table below, along with the parties' positions as to the appropriate amounts which should be awarded.

| Provider/Expense | Petitioner | Respondent |
|---|---|---|
| CVS Prescription Expenses | $130.20 | $42.58 |
| CVS Health Spending Account | $955.69 | $287.80 |
| Payflex Health Spending Account | $500.00 | $500.00 |
| HealthOne Behavioral Health | $554.06 | |
| Explanation of Benefits | No proof of actual payments | $0.00 |
| TOTAL | $2,139.95 | $830.80 |

Pet. Out-of-Pocket Memo. at 2.

Each of these categories are addressed in turn.

A.    CVS Prescription Expenses

Petitioner seeks reimbursement for prescriptions costs, as set forth in detail below.

| Exhibit Citation | Date of Service | Provider | Prescription | Amount Paid | Related |
|---|---|---|---|---|---|
| Pet. Ex. 70 at 42 | 4/26/2017 | S.U. Qureshi | Sertraline | $8.88 | |
| Pet. Ex. 70 at 42 | 4/26/2017 | S.U. Qureshi | Clonazepam | $3.84 | |
| Pet. Ex. 70 at 42 | 5/23/2017 | J. Zheng | Clonazepam | $3.84 | |
| Pet. Ex. 70 at 42 | 7/2/2017 | S.U. Qureshi | Clonazepam | $3.84 | |
| Pet. Ex. 70 at 42 | 6/8/2017 | S.U. Qureshi | Tramadol | $1.52 | |
| Pet. Ex. 70 at 42 | 6/8/2017 | Q. Vu | Paroxetine | $2.63 | |
| Pet. Ex. 70 at 42 | 8/24/2017 | A. Rafiq | Carisoprodol | $6.92 | |
| Pet. Ex. 70 at 44 | 3/11/2020 | J. Zheng | Clonazepam | $1.33 | |
| Pet. Ex. 70 at 44 | 4/28/2020 | J. Zheng | Clonazepam | $1.23 | |
| Pet. Ex. 70 at 44 | 12/9/2019 | J. Zheng | Zolpidem | $14.10 | |
| Pet. Ex. 70 at 44 | 1/14/2020 | J. Zheng | Zolpidem | $0.79 | |
| Pet. Ex. 70 at 44 | 2/10/2020 | J. Zheng | Zolpidem | $0.79 | |
| Pet. Ex. 70 at 44 | 2/24/2020 | J. Zheng | Zolpidem | $1.22 | |
| Pet. Ex. 70 at 44 | 2/19/2020 | J. Zheng | Sertraline | $2.14 | |
| Pet. Ex. 70 at 44 | 3/26/2020 | J. Zheng | Zolpidem | $1.22 | |
| Pet. Ex. 70 at 44 | 4/28/2020 | J. Zheng | Zolpidem | $1.12 | |

---

[20] Petitioner previously asserted he was owed $3,499.00 for out-of-pocket costs. Pet. Ex. 70 at 1.

| | | | | | |
|---|---|---|---|---|---|
| Pet. Ex. 70 at 44 | 5/27/2020 | J. Zheng | Zolpidem | $1.12 | |
| Pet. Ex. 70 at 44 | 6/15/2020 | J. Zheng | Lorazepam | $1.39 | |
| Pet. Ex. 70 at 44 | 7/23/2020 | J. Zheng | Lorazepam | $1.16 | |
| Pet. Ex. 70 at 44 | 8/20/2020 | J. Zheng | Lorazepam | $1.16 | |
| Pet. Ex. 70 at 44 | 6/25/2020 | J. Zheng | Zolpidem | $1.12 | |
| Pet. Ex. 70 at 44 | 7/23/2020 | J. Zheng | Zolpidem | $0.94 | |
| Pet. Ex. 70 at 44 | 8/20/2020 | J. Zheng | Zolpidem | $0.94 | |
| Pet. Ex. 70 at 44 | 6/15/2020 | J. Zheng | Paroxetine | $2.24 | |
| Pet. Ex. 70 at 44 | 7/22/2020 | J. Zheng | Paroxetine | $1.83[21] | |
| Pet. Ex. 70 at 44 | 8/20/2020 | J. Zheng | Paroxetine | $1.83 | |
| Pet. Ex. 70 at 44 | 9/14/2020 | J. Zheng | Clonazepam | $1.42 | |
| Pet. Ex. 70 at 44 | 9/14/2020 | J. Zheng | Zolpidem | $0.94 | |
| Pet. Ex. 70 at 44 | 9/24/2020 | J. Zheng | Zolpidem | $0.94 | |
| Pet. Ex. 70 at 45 | 10/21/2020 | J. Zheng | Clonazepam | $1.27 | |
| Pet. Ex. 70 at 45 | 10/21/2020 | J. Zheng | Paroxetine | $2.71 | |
| Pet. Ex. 70 at 45 | 11/21/2020 | J. Zheng | Zolpidem | $0.63 | |
| Pet. Ex. 70 at 45 | 11/21/2020 | J. Zheng | Clonazepam | $1.27 | |
| Pet. Ex. 70 at 45 | 11/19/2020 | J. Zheng | Sertraline | $4.53 | |
| Pet. Ex. 70 at 46 | 10/6/2014 | S. Mukardamwala | Prednisone | $5.47 | $5.47 |
| Pet. Ex. 70 at 46 | 10/6/2014 | S. Mukardamwala | Valacyclovir | $24.53 | $24.53 |
| Pet. Ex. 70 at 46 | 10/6/2014 | S. Mukardamwala | Cyanocobalamin | $10.56 | $10.56[22] |
| Pet. Ex. 70 at 46 | 10/6/2014 | S. Mukardamwala | Lorazepam | $0.23 | $0.23 |
| Pet. Ex. 70 at 46 | 10/6/2014 | S. Mukardamwala | Acetaminophen | $1.38 | $1.38 |
| Pet. Ex. 70 at 47 | 2/25/2015 | S. Mukardamwala | Methocarbamol | $0.44 | $0.44 |
| Pet. Ex. 70 at 48 | 7/7/2015 | A. Rafiq | Carisoprodol | $2.03 | |
| Pet. Ex. 70 at 48 | 8/18/2015 | A. Rafiq | Carisoprodol | $4.06 | |
| Pet. Ex. 70 at 48 | 10/11/2015 | A. Rafiq | Carisoprodol | $4.06 | |
| | | | Totals[23] | $135.61 | $42.61 |

Resp. Out-of-Pocket Br. at 4-6; see also Pet. Out-of-Pocket Memo. at 2-12; Pet. Ex. 70 at 42-49.

Respondent agrees to reimburse Petitioner for the costs of prescriptions obtained October 6, 2014 and February 25, 2015. Resp. Out-of-Pocket Br. at 4. However, Respondent disagrees that prescriptions from 2017 to 2020 are related to the treatment of Bell's palsy. Id.

---

[21] According to Petitioner's documentation, this amount was $1.83, not $1.84 as written in Respondent's chart. See Resp. Out-of-Pocket Br. at 5; Pet. Out-of-Pocket Memo. at 7.

[22] According to Petitioner's documentation, this amount was $10.56, not $10.58 or $10.53 as written in Respondent's chart. See Pet. Ex. 70 at 46; Pet. Out-of-Pocket Memo. at 9.

[23] Respondent totaled this amount to equal $135.64 and Petitioner totaled this amount to equal $130.20. See Resp. Out-of-Pocket Br. at 6; Pet. Out-of-Pocket Memo. at 2. The undersigned has corrected the chart and the total amounts given the above-mentioned errors. See supra notes 21-22.

Petitioner received medical treatment for his Bell's palsy from October 2014 through January 2015, including prescription medications. Additionally, he received psychiatric treatment for anxiety, depression, and PTSD March 2015 through April 2016, which also included treatment with prescription medications. At his visit to Dr. Qureshi on April 13, 2016, Petitioner reported that he was "doing fine." Pet. Ex. 8 at 8. After April 13, 2016, there is no documentation to suggest that Petitioner sought or received psychiatric care related to his Bell's palsy. He did not return to see Dr. Qureshi until one year later, on April 26, 2017, and at that time, Petitioner attributed his anxiety to his ongoing divorce. Therefore, the undersigned finds that Petitioner's prescription costs after April 13, 2016, were not incurred due to his vaccine-related injury and are not reimbursable. Thus, the undersigned agrees with Respondent and finds Petitioner is entitled to reimbursement for this category of expenses in the amount of **$42.61**.

### B.   CVS Health Spending Account

The second category of expenses relates to Petitioner's CVS Health Spending Account. Petitioner seeks reimbursement of $955.69.[24] Pet. Out-of-Pocket Memo. at 2. Respondent agrees to $287.80 of this amount. Resp. Out-of-Pocket Br. at 6. The detailed chart is set forth below.

| Exhibit Citation | Date of Service | Provider | Amount Paid by Card | Related |
|---|---|---|---|---|
| Pet. Ex. 70 at 51 | 6/7/2017 | Texas Behavioral Health | $125.00 | |
| Pet. Ex. 70 at 51 | 5/10/2017 | Texas Behavioral Health | $125.00 | |
| Pet. Ex. 70 at 51 | 5/2/2017 | United HealthCare – Monthly Premium | $377.50 | |
| Pet. Ex. 70 at 52 | 4/26/2017 | Texas Behavioral Health | $125.00 | |
| Pet. Ex. 70 at 52 | 4/4/2017 | United HealthCare – Monthly Premium | $377.50 | |
| Pet. Ex. 70 at 52 | 3/2/2017 | United HealthCare – Monthly Premium | $377.50 | |
| Pet. Ex. 70 at 53 | 4/13/2016 | Houston Psychiatry Health | $35.00 | |
| Pet. Ex. 70 at 54 | 1/13/2016 | Houston Psychiatry Health | $144.72 | |
| Pet. Ex. 70 at 54 | 10/28/2015 | Elite Care Emergency Center (Handwritten for ER treatment 10/5/2014) | $100.00 | $100.00 |
| Pet. Ex. 70 at 54 | 10/28/2015 | Greater Houston Emergency (Handwritten for ER treatment 10/5/2014) | $93.90 | $93.90 |
| Pet. Ex. 70 at 55 | 10/20/2015 | Houston Psychiatry Health | $205.19 | |
| Pet. Ex. 70 at 55 | 7/25/2015 | Quest Diagnostics | $79.18 | |

---

[24] Petitioner previously included charges for health care premiums and payments to Texas Behavioral Health in this request, as evidenced by Respondent's chart. See Resp. Out-of-Pocket Br. at 6-7. However, Petitioner excluded health care premium costs from his final out-of-pocket request and moved payments to Texas Behavioral Health to a separate category detailed below. See Pet. Out-of-Pocket Memo. at 1-3.

| | | | | |
|---|---|---|---|---|
| Pet. Ex. 70 at 56 | 7/20/2015 | Southeast Medical Group | $25.31 | |
| Pet. Ex. 70 at 56 | 7/8/2015 | Quest Diagnostics | $6.23 | |
| Pet. Ex. 70 at 56 | 7/6/2015 | Southeast Medical Group | $172.26 | |
| Pet. Ex. 70 at 56 | 7/1/2015 | Emergency Center (Handwritten for ER treatment 10/5/2014) | $93.90 | $93.90 |
| | | **Totals** | **$2,463.19** | **$287.80** |

Resp. Out-of-Pocket Br. at 6-7; <u>see also</u> Pet. Out-of-Pocket Memo. at 2-3, 13-20; Pet. Ex. 70 at 50-56.

Respondent agrees to reimburse Petitioner for the costs of care on October 5, 2014. Resp. Out-of-Pocket Br. at 6. However, Respondent asserts the other costs do not relate to treatment of Bell's palsy, or were payment for health insurance premiums, which are considered a routine expense. <u>Id.</u> "Petitioner agree[d] that charges for healthcare premiums are not a reimbursable expense" and removed that request. Pet. Out-of-Pocket Memo. at 2.

The undersigned agrees with Respondent that costs for psychiatric care after April 2016, are not related to Petitioner's Bell's palsy, and that these costs are therefore not reimbursable. However, the undersigned will reimburse Petitioner for these costs through April 2016 for the reasons explained above. Therefore, in addition to the amounts agreed to by Respondent, the undersigned also finds it reasonable and appropriate to reimburse the costs for Petitioner's visit to Dr. Qureshi on October 20, 2015 (Houston Psychiatry Health) in the amount of $205.19. The undersigned also finds Petitioner is entitled to reimbursement for his visits to Dr. Qureshi on January 13, 2016 ($144.72) and April 13, 2016 ($35.00).

Regarding dates of service on July 6, 8, 20, and 25, 2015, for two visits to Quest Diagnostics and two visits to Southeast Medical Group, it does not appear that medical records for these diagnostic studies or visits to Southeast Medical Group have been filed. Without evidence to establish that these expenses are related, the undersigned is unable to find them reimbursable.[25]

Therefore, for this category of out-of-pocket expenses, the undersigned awards a total of **$672.71**, which includes Respondent's recommended costs ($287.80) as well as the three visits to Dr. Qureshi on October 20, 2015 ($205.19), January 13, 2016 ($144.72), and April 13, 2016 ($35.00).

### C.    Payflex Health Spending Account

The third category is for reimbursement of the cost of a brain MRI done October 14, 2014, in the amount of $500.00. Resp. Out-of-Pocket Br. at 7; Pet. Out-of-Pocket Memo. at 3, 23; Pet. Ex. 70 at 58. Respondent agrees to this expense of $500.00. Resp. Out-of-Pocket Br. at 7. The undersigned finds this expense relates to the diagnosis and treatment of Petitioner's vaccine-related injury and therefore, it is reimbursable.

---

[25] Petitioner did not file an exhibit list to assist in identifying the filed medical records.

### D.     HealthOne Behavioral Health (formerly Texas Behavioral Health)

The last category of disputed expenses reflects Petitioner's payments to HealthOne Behavioral Health, formerly Texas Behavioral Health, in the amount of $554.06, for office visits/psychotherapy for treatment of his depression, anxiety, and PTSD.  Pet. Out-of-Pocket Memo. at 2-3, 26-32.  Petitioner seeks reimbursement for treatments on April 26, 2017 ($125.00), May 10, 2017 ($125.00), June 7, 2017 ($125.00), July 23, 2019 ($79.06), January 10, 2023 ($30.00 no show fee), March 4, 2024 ($55.00), and June 4, 2024 ($15.00).  Id. at 26-32.

As explained above in the factual summary, Petitioner did not see Dr. Qureshi (or anyone else in his office) after his visit on April 13, 2016, until April 26, 2017, a period of one year.  See Pet. Ex. 8 at 8-9.  When he returned on April 26, 2017, Petitioner requested medication refills for anxiety due to his ongoing divorce, care of his daughter, and job search.  There is no documentation in his records to suggest that Petitioner was experiencing emotional distress at this time due to Bell's palsy.

The same is true for follow up visits throughout 2017.  Petitioner returned for follow-up of his anxiety to Dr. Qureshi's office on May 10, 2017, and saw Jie Zheng, PA.  Petitioner was "less depressed and less anxious."  Pet. Ex. 8 at 11.  He reported "sleeping better."  Id.  He was under stress due to family issues. Id. at 11-12.  At the next follow-up visit on June 7, 2017, Petitioner saw Quynh Tu Vu, PA.  Id. at 13.  Petitioner attributed his anxiety and depression to his ongoing divorce proceeding and child custody trial.  Id.

Moving forward to 2019, Petitioner returned to the office and was seen by Jie Zheng, PA several times.  See Pet. Ex. 46 at 23-44.  On July 23, 2019, he was "stressed due to denial of disability application," "back pain," and finances.  Id. at 38.

The undersigned did not find a medical record reflecting a visit to Dr. Tariq's office on January 10, 2023, which would explain his "no show fee" of $30.00.  Medical records for visits on March 4, 2024 and June 4, 2024 were not provided.[26]

Again, the undersigned finds that Petitioner's emotional distress due to Bell's palsy was limited in time from October 2014 to April 2016, after which his emotional distress was attributed to other causes.  The records from the visits for which Petitioner's seeks reimbursement do not provide support that the care and treatment received was for treatment of emotional distress related to Bell's palsy.  Further, there are no records for the dates in 2024 to support reimbursement of costs related to those visits.  Thus, the undersigned will not award reimbursement of $554.06 for these visits.

---

[26] Petitioner has not filed any medical records since 2023.

### E.    Total Award for Reimbursable Expenses

The total award for out-of-pocket expenses is **$1,215.32**, as follows:

| Provider/Expense | Amount Awarded |
|---|---|
| CVS Prescription Expenses | $42.61 |
| CVS Health Spending Account | $672.71 |
| Payflex Health Spending Account | $500.00 |
| HealthOne Behavioral Health | $0.00 |
| **TOTAL** | **$1,215.32** |

## V.    CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case.  Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in one other case, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned awards Petitioner:

> **A lump sum payment of $129,346.32, representing $125,000.00 in actual pain and suffering, $3,131.00 in lost wages, and $1,215.32 in past unreimbursable expenses, to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** herewith.[27]

**IT IS SO ORDERED.**

<u>**s/Nora Beth Dorsey**</u>
Nora Beth Dorsey
Special Master

---

[27] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of notice renouncing the right to seek review.